## MILLER *v.* UNITED STATES.

No. 126.   Argued January 28, 1958.—Decided June 23, 1958.

*De Long Harris* argued the cause and filed a brief for petitioner.

*Leonard B. Sand* argued the cause for the United States.   On the brief were *Solicitor General Rankin, Acting Assistant Attorney General McLean* and *Beatrice Rosenberg.*

Mr. Justice Brennan delivered the opinion of the Court.

Petitioner, William Miller, together with Bessie Byrd and her brother, Arthur R. Shepherd, was tried and convicted in the District Court for the District of Columbia for conspiracy to commit violations, and violations, of the federal narcotics laws. 26 U. S. C. (Supp. V) § 4704 (a), 21 U. S. C. § 174, 18 U. S. C. § 371. The Court of Appeals for the District of Columbia Circuit affirmed, one judge dissenting, 100 U. S. App. D. C. 302, 244 F. 2d 750. We granted certiorari, 353 U. S. 957, to determine whether evidence seized at the time of petitioner's arrest was properly admitted against the petitioner. The evidence was $100 of marked currency which was seized by the federal officers who arrested the petitioner and Bessie Byrd at their apartment.

On March 25, 1955, at 1:35 a. m., Clifford Reed was arrested, under an arrest warrant, on a Washington, D. C., street on suspicion of narcotics offenses. Reed revealed to Wilson, a federal narcotics agent, that he purchased heroin in 100-capsule quantities from the petitioner through Shepherd. Agent Wilson knew of the petitioner as one who had trafficked in narcotics and had been convicted for a narcotics offense in 1953. Reed said that he was to meet Shepherd later that morning to make a purchase. Agent Wilson enlisted his aid to apprehend Shepherd and the petitioner. About 3 a. m. another federal narcotics agent, Lewis, carrying $100 of marked currency, went with Reed in a taxicab to Shepherd's home. Reed introduced Lewis to Shepherd as a buyer. Shepherd accepted the $100 and agreed to secure 100 capsules of heroin from the petitioner and deliver them to Lewis at Reed's apartment. Shepherd proceeded alone in the taxicab to the petitioner's apartment.

The taxicab was followed by agent Wilson, officer Wurms of the Metropolitan Police Department, and other officers in police cars.[1] Shepherd was seen to leave the taxicab in front of the apartment house where the petitioner and Bessie Byrd occupied a two-room-and-bath basement apartment. The taxicab waited. Shepherd entered the basement but agent Wilson, who looked into the basement hall, could not see where he went. Shepherd came out of the basement within a few minutes and re-entered the taxicab. The taxicab was proceeding toward Reed's apartment when the officers following in the police cars intercepted it. Shepherd was arrested and searched. He did not have the marked bills on his person but admitted to agent Wilson and officer Wurms that a package of 100 capsules of narcotics found under the taxicab's front seat was put there by him when the police cars stopped the taxicab. He said that he had taken the package from behind a fire extinguisher in the basement hall where he had been sent by a "féllow" with Reed who had promised him $10 for getting it.

The federal officers returned immediately to the apartment building. About 3:45 a. m. agent Wilson and officer Wurms went to the door of the petitioner's apartment. Officer Wurms knocked and, upon the inquiry from within—"Who's there?"—replied in a low voice, "Police." The petitioner opened the door on an attached door chain and asked what the officers were doing there. Before either responded, he attempted to close the door. Thereupon, according to officer Wurms, "we put our hands inside the door and pulled and ripped the chain off,

---

[1] The group included two Federal Bureau of Narcotics agents, Wilson and Pappas, officer Wurms of the District of Columbia Metropolitan Police Department, and officers Bowman and Thompson of the Virginia State Police, who were trainees in the narcotics program of the State of Virginia.

and entered." [2]    The officers had no arrest or search warrant.    They did not expressly demand admission or state their purpose for their presence,[3] nor did they place the petitioner under arrest until after they entered the apartment.

Bessie Byrd was also arrested in the apartment and turned over the cash she had in her housecoat.    The cash included $34 of the marked currency.    After an extended search the remaining $66 of marked currency was found, some in a hatbox in a closet, and the rest within the covers of a bed in the bedroom.

The Government contends that there was probable cause for arresting the petitioner and that the marked cur-

---

[2] Officer Wurms testified:

"The Witness: Agent Wilson and I were at the front door of the apartment No. 1, 1337 Columbia Road.  I knocked on the front door. I said—somebody asked, 'Who's there?'  I said, 'Blue' [the petitioner's nickname]—in a low voice, I said 'Police.'

"I repeated it two or three times, in that manner.

"The door opened.  There was a chain on the door.  Blue Miller saw me, Agent Wilson, and I don't know who else he saw but he tried to close the door and at that time we put our hands inside the door and pulled and ripped the chain off, and entered."

[3] At the trial, but not at the hearing on the motion to suppress, agent Wilson testified, "He said, 'What do you-all want?'  And we says, 'Police, you are under arrest, we want in.'  He says he was not going to let us in, or something like that, and so officer Wurms took ahold of the door and pulled it open."  But apparently the Government is satisfied that agent Wilson was mistaken in saying that there was mention of the purpose to arrest.  His testimony on the motion to suppress as well as the testimony of officer Wurms, both on the motion and at the trial, is contrary.  The Government in its brief refers to this testimony merely in footnotes.  Its brief accepts the petitioner's premise that the case should be decided upon the basis that the evidence shows that the officers did not formally announce their purpose.  The Court of Appeals decided the case on the basis that Wilson did not make the statement.  100 U. S. App. D. C. 302, 306, 244 F. 2d 750, 754.

rency was properly admitted in evidence because it was seized as an incident to a lawful arrest. *Harris* v. *United States,* 331 U. S. 145. The petitioner's argument breaks down into three contentions: (1) that the officers had no probable cause to arrest the petitioner without a warrant; (2) that the search was not justified as being an incident of a lawful arrest; (3) that the arrest, and therefore the search, was in any event unlawful because the officers broke the door of petitioner's home without first giving notice of their authority and purpose in demanding admission. If any one of these contentions prevails, it is agreed that the marked money was inadmissible in evidence. In the view we take, we need consider only petitioner's third contention.

The lawfulness of the arrest of petitioner depends upon the power of the arresting officers to "break" the doors of a home in order to arrest without warrant persons suspected of having committed narcotics offenses. Agent Wilson did not have statutory authority to arrest without a warrant although officer Wurms, as a member of the Metropolitan Police Department, did have such authority.[4] This Court has said, in the similar circumstance of an arrest for violation of federal law by state peace officers, that the lawfulness of the arrest without warrant is to be determined by reference to state law. *United States* v. *Di Re,* 332 U. S. 581, 589; *Johnson* v. *United States,* 333 U. S. 10, 15. By like reasoning the validity of the arrest

---

[4] Narcotics agents were subsequently given authority by 26 U. S. C. § 7607, added July 18, 1956, to make an arrest where the agents have "reasonable grounds to believe that the person to be arrested has committed" a narcotics offense. In the District of Columbia peace officers having probable cause to believe that a felony is being, or has been, committed are empowered to arrest without a warrant. *Wrightson* v. *United States,* 98 U. S. App. D. C. 377, 378, 236 F. 2d 672, 673 (C. A. D. C. Cir.).

of petitioner is to be determined by reference to the law of the District of Columbia.

In making reference to that law we are mindful of our policy of not interfering with local rules of law fashioned by the courts of the District of Columbia. *Fisher* v. *United States,* 328 U. S. 463, 476; *Griffin* v. *United States,* 336 U. S. 704, 715. But the Government agrees with petitioner that the validity of the entry to execute the arrest without warrant must be tested by criteria identical with those embodied in 18 U. S. C. § 3109, which deals with entry to execute a search warrant.[5] That section provides that an officer, executing a search warrant, may break open a door only if, "after notice of his authority and purpose," he is denied admittance. The Government states in its brief that, "where an arrest is made on probable cause rather than a warrant, these statutory requirements must be met before an officer can force entry into an apartment." These statutory requirements are substantially identical to those judicially developed by the Court of Appeals for the District of Columbia Circuit in *Accarino* v. *United States,* 85 U. S. App. D. C. 394, 403, 179 F. 2d 456, 465. Since the rule of *Accarino* bears such a close relationship to a statute which is not confined in operation to the District of Columbia, we believe that review is warranted here. Cf. *Del Vecchio* v. *Bowers,* 296 U. S. 280; *Carroll* v. *United States,* 354 U. S. 394, 414.

From earliest days, the common law drastically limited the authority of law officers to break the door of a house

---

[5] 18 U. S. C. § 3109:

"The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

The petitioner does not raise a question of the application of D. C. Code, 1951, § 4–141. See also § 4–145.

to effect an arrest.[6]  Such action invades the precious interest of privacy summed up in the ancient adage that a man's house is his castle.  As early as the 13th Yearbook of Edward IV (1461–1483), at folio 9, there is a recorded holding that it was unlawful for the sheriff to break the doors of a man's house to arrest him in a civil suit in debt or trespass, for the arrest was then only for the private interest of a party.  Remarks attributed[7] to William Pitt, Earl of Chatham, on the occasion of debate in Parliament on the searches incident to the enforcement of an excise on cider, eloquently expressed the principle:

> "The poorest man may in his cottage bid defiance to all the forces of the Crown.  It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!"

But the common law recognized some authority in law officers to break the door of a dwelling to arrest for felony. The common-law authorities differ, however, as to the circumstances in which this was the case.  Hawkins says: "where one lies under a probable Suspicion only, and is not indicted, it seems the better Opinion at this Day, That no one can justify the Breaking open Doors in Order to

---

[6] Judge Prettyman's opinion for the Court of Appeals in *Accarino* v. *United States*, 85 U. S. App. D. C. 394, 179 F. 2d 456, discusses comprehensively the development of the law.  See also the exhaustive article, Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 673, 798 (1924).

[7] The Oxford Dictionary of Quotations (2d ed. 1953), 379.  In Hansard, Parliamentary History of England (1813), vol. 15, column 1307, under the proceedings in the Commons on the cider tax in March, 1763, we find: "Mr. Pitt spoke against this measure, particularly against the dangerous precedent of admitting the officers of excise into private houses.  Every man's house was his castle, he said."

apprehend him." 2 Hawkins, Pleas of the Crown (1762), c. 14, § 7; see also Foster, Crown Law (1762), 320–321. Coke appears to have been of the same view, and to have thought that the breaking of a house was limited to cases in which a writ, now our warrant, had issued. Co. 4th Inst. 177. On the other hand, Hale says that "A man, that arrests upon suspicion of felony, may break open doors, if the party refuse upon demand to open them . . . ." 1 Hale, Pleas of the Crown (1736), 583.

Whatever the circumstances under which breaking a door to arrest for felony might be lawful, however, the breaking was unlawful where the officer failed first to state his authority and purpose for demanding admission. The requirement was pronounced in 1603 in *Semayne's Case,* 5 Co. Rep. 91a, 11 E. R. C. 629, 77 Eng. Repr. 194, at 195: "In all cases where the King is party, the sheriff (if the doors be not open) may break the party's house, either to arrest him, or to do other execution of the K[ing]'s process, if otherwise he cannot enter. *But before he breaks it, he ought to signify the cause of his coming, and to make request to open doors . . . ."* (Emphasis supplied.)

The requirement stated in *Semayne's Case* still obtains. It is reflected in 18 U. S. C. § 3109, in the statutes of a large number of States,[8] and in the American Law

---

[8] Ala. Code, 1940, Tit. 15, § 155; Ariz. Rev. Stat. Ann., 1955, § 13–1411; Deering's Cal. Penal Code, § 844; Fla. Stat., 1957, 901.17; Idaho Code, 1947, § 19–611; Burns' Ann. Ind. Stat., 1956, Replacement Vol., § 9–1009; Iowa Code Ann., 1949, § 755.9; Kan. Gen. Stat., 1949, 62–1819; Ky. Rev. Stat., 1953, § 70.078; Dart's La. Crim. Code, 1943, Art. 72; Mich. Stat. Ann., 1954, § 28.880; Minn. Stat., 1945, § 629.34; Miss. Code, 1942, § 2471; Mo. Rev. Stat., 1949, § 544.200; Mont. Rev. Codes, 1947, 94–6011; Neb. Rev. Stat., 1943, § 29–411; Nev. Rev. Stat., 1957, 171.275; Clevenger-Gilbert's N. Y. Crim. Code, 1956, § 178; N. C. Gen. Stat., 1953, § 15–44; Page's Ohio Rev. Code Ann., 1953, § 2935.15; Okla. Stat. Ann., Tit. 22, § 194; Ore. Comp. Laws Ann., 1940, § 26–1530; S. C. Code, 1952,

Institute's proposed Code of Criminal Procedure, § 28.[9] It applies, as the Government here concedes, whether the arrest is to be made by virtue of a warrant, or when officers are authorized to make an arrest for a felony without a warrant. There are some state decisions holding that justification for noncompliance exists in exigent circumstances, as, for example, when the officers may in good faith believe that they or someone within are in peril of bodily harm, *Read* v. *Case,* 4 Conn. 166, or that the person to be arrested is fleeing or attempting to destroy evidence. *People* v. *Maddox,* 46 Cal. 2d 301, 294 P. 2d 6.

But whether the unqualified requirements of the rule admit of an exception justifying noncompliance in exigent circumstances is not a question we are called upon to decide in this case. The Government makes no claim here of the existence of circumstances excusing compliance. The Government concedes that compliance was required but argues that "compliance is evident from the events immediately preceding the officers' forced entry."

The rule seems to require notice in the form of an express announcement by the officers of their purpose for demanding admission. The burden of making an express announcement is certainly slight. A few more words by

§ 53–198; S. D. Code, 1939, § 34.1606; Tenn. Code Ann., 1955, § 40–807; Utah Code Ann., 1953, 77–13–12; Remington's Wash. Rev. Stat., 1932, § 2082; Wyo. Comp. Stat., 1945, § 10–309.

[9] Code of Crim. Proc., American Law Institute, Official Draft (1930), § 28:

"*Right of officer to break into building.* An officer, in order to make an arrest either by virtue of a warrant, or when authorized to make such arrest for a felony without a warrant, as provided in section 21, may break open a door or window of any building in which the person to be arrested is or is reasonably believed to be, if he is refused admittance after he has announced his authority and purpose."

the officers would have satisfied the requirement in this case. It may be that, without an express announcement of purpose, the facts known to officers would justify them in being virtually certain that the petitioner already knows their purpose so that an announcement would be a useless gesture. Cf. *People* v. *Martin*, 45 Cal. 2d 755, 290 P. 2d 855; Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 798, 802 (1924).[10] But even by that test the evidence upon which the Government relies was not sufficient to justify the officers' failure expressly to notify the petitioner that they demanded admission to his apartment for the purpose of arresting him.

The single fact known to the officers upon which the Government relies is the "split-second" occurrence in which the petitioner evinced "instantaneous resistance to their entry," an "almost instinctive attempt to bar their entry after they [the officers] had identified themselves as police . . . ." It is argued that this occurrence "certainly points up that he knew their purpose immediately . . . [and], at once, realized that he had been detected and that the officers were there to arrest him";

---

[10] Professor Wilgus sums up his discussion of the breaking of doors thus: "Before doors are broken, there must be a necessity for so doing, and notice of the authority and purpose to make the arrest must be given and a demand and refusal of admission must be made, unless this is already understood, or the peril would be increased." 22 Mich. L. Rev. 798, 802. (Footnotes omitted.) The dissenting opinion herein, in footnote 1, mistakenly refers to this passage as if it were a holding "enunciated" by the Court of Appeals. In fact, this passage was merely quoted without approval. The holding was: "Upon one topic there appears to be no dispute in the authorities. Before an officer can break open a door to a home, he must make known the cause of his demand for entry. There is no claim in the case at bar that the officers advised the suspect of the cause of their demand before they broke down the door." *Accarino* v. *United States*, 85 U. S. App. D. C. 394, 403, 179 F. 2d 456, 465.

that "[i]t would be wholly unrealistic to say that the officers had not made their purpose known because they did not more formally announce that they were there to arrest him."

But, first, the fact that petitioner attempted to close the door did not of itself prove that he knew their purpose to arrest him. It was an ambiguous act. It could have been merely the expected reaction of any citizen having this experience at that hour of the morning, particularly since it does not appear that the officers were in uniform, cf. *Accarino* v. *United States, supra,* 85 U. S. App. D. C., at 403, 179 F. 2d, at 465, and the answer "Police" was spoken "in a low voice" and might not have been heard by the petitioner so far as the officers could tell.

Second, petitioner's reaction upon opening the door could only have created doubt in the officers' minds that he knew they were police intent on arresting him. On the motion to suppress, agent Wilson testified that "he wanted to know what we were doing there." This query, which went unanswered, is on its face inconsistent with knowledge. The majority of the Court of Appeals denied the import of the query by inferring that Miller knew Wilson and Wurms personally and recognized them as soon as he opened the door. That inference has no support in the record.[11] But even if this inference were

---

[11] Judge Holtzoff heard the motion to suppress over two months before the trial. Our examination of the record made at that time brings us into complete agreement with Judge Edgerton, who, dissenting in the Court of Appeals, said, "I find no evidence, and the court cites no evidence, that supports an inference that Miller even recognized the officers as the narcotics squad." 100 U. S. App. D. C. 302, 311, 244 F. 2d 750, 759. Even if petitioner could have seen the officers sufficiently to make out their faces, there is no evidence that he knew them personally. The record at best supports an inference, not that either officer personally knew Miller, or that Miller had met, or even heard of, either officer, but only that

supportable, Miller's recognition of Wilson and Wurms as police officers would not have justified them, in light of other facts known to them, in being virtually certain that Miller actually knew the reason for their presence. The officers knew that petitioner was unaware of Shepherd's arrest; they knew that he was unaware that the currency was marked; they knew that he was unaware that their presence was pursuant to a plan, initiated by Reed's disclosures, to catch the petitioner in a criminal act. Moreover, they did not actually know that petitioner had made a sale to Shepherd and received the marked money, for Shepherd had not talked and had not been seen to enter petitioner's apartment. The fact that the marked money was found in the apartment has no bearing upon the petitioner's knowledge of the officers' purpose since he did not know that the money was marked. This Court said in *United States* v. *Di Re, supra,* at 595: "We have had frequent occasion to point out that a search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success." The most that can be said is that the petitioner's act in attempting to close the door might be the basis for the officers being virtually certain that the petitioner knew there were police at his door conducting an investigation. This, however, falls short of a

the officers knew *of him* as a reputed narcotics violator. Judge Youngdahl presided at the trial and refused to hear a renewed motion to suppress because he considered the matter settled by Judge Holtzoff's ruling. Agent Wilson's testimony at the trial was again at variance with his testimony before Judge Holtzoff as it had been on the question whether the officers had communicated their purpose to arrest. At the trial he testified that Miller had met him on one occasion before the night of the arrest. Apparently unwilling to rely on this testimony, in the face of its inconsistency, the majority of the Court of Appeals did not allude to it as the basis for its conclusion that Miller recognized the officers.

virtual certainty that the petitioner knew of their purpose to arrest him. The requirement is not met except by notice of that purpose, for the Government admits that the officers had no authority to break the petitioner's door except to arrest him. We must, therefore, conclude that the petitioner did not receive the required notice of authority and purpose.

We are duly mindful of the reliance that society must place for achieving law and order upon the enforcing agencies of the criminal law. But insistence on observance by law officers of traditional fair procedural requirements is, from the long point of view, best calculated to contribute to that end. However much in a particular case insistence upon such rules may appear as a technicality that inures to the benefit of a guilty person, the history of the criminal law proves that tolerance of short-cut methods in law enforcement impairs its enduring effectiveness. The requirement of prior notice of authority and purpose before forcing entry into a home is deeply rooted in our heritage and should not be given grudging application. Congress, codifying a tradition embedded in Anglo-American law, has declared in § 3109 the reverence of the law for the individual's right of privacy in his house.[12] Every householder, the good and the bad, the guilty and the innocent, is entitled to the protection designed to secure the common interest against unlawful invasion of the house. The petitioner could not be lawfully arrested in his home by officers breaking in without first giving him notice of their authority and purpose. Because the petitioner did not receive that

---

[12] Compliance is also a safeguard for the police themselves who might be mistaken for prowlers and be shot down by a fearful householder. See concurring opinion in *McDonald* v. *United States*, 335 U. S. 451, 460–461.

notice before the officers broke the door to invade his
home, the arrest was unlawful, and the evidence seized
should have been suppressed.

*Reversed.*

MR. JUSTICE HARLAN concurs in the result.

MR. JUSTICE CLARK, with whom MR. JUSTICE BURTON
concurs, dissenting.

I agree that a requirement of prior notice of authority
and purpose should not be given a "grudging" application.
But by the same token it should not be reduced to an
absurdity. A majority of the Court of Appeals has con-
cluded that petitioner, at the time the police entered his
apartment, "already fully understood who the officers
were and that they sought to arrest him." 100 U. S.
App. D. C. 302, 310, 244 F. 2d 750, 758. The entry, there-
fore, was held valid under District of Columbia law.[1]

---

[1] The rule in the District with which the Court of Appeals found
compliance was enunciated in *Accarino* v. *United States,* 85 U. S. App.
D. C. 394, 179 F. 2d 456 (opinion by Judge Prettyman). Rehearing
*en banc* in the instant case was denied without dissent, with the author
of *Accarino* participating.

In discussing the local rule, Judge Prettyman in *Accarino* quoted
with approval from Wilgus, Arrest Without a Warrant, 22 Mich.
L. Rev. 798, 802: "Before doors are broken, there must be a necessity
for so doing, and notice of the authority and purpose to make the
arrest must be given and a demand and refusal of admission must
be made, *unless this is already understood, or the peril would be
increased.*" (Emphasis added.) 85 U. S. App. D. C., at 401, 179
F. 2d, at 463. The Court of Appeals in the instant case recognized
this language as the embodiment of the local rule, 100 U. S. App.
D. C., at 309, 244 F. 2d, at 757, and in finding that petitioner "already
fully understood who the officers were and that they sought to arrest
him," 100 U. S. App. D. C., at 310, 244 F. 2d, at 758, applied that
rule in affirming the conviction.

This Court now concludes that the rule "judicially developed" in
the District is "substantially identical" to 18 U. S. C. § 3109, which

This Court now superimposes upon the local rule of the District an artificial and unrealistic requirement that, even under the circumstances found here, police must make "an express announcement" in unmistakable words that they are the police and have come to make an arrest.

The Court attempts to justify interference in local law by what it terms a "concession" of the Government that validity of the entry must be tested by a federal statute relating to forcible entry to execute a search warrant.[2] But the fact that the Government seeks clarification of a general federal statute, possibly to serve its purposes in prosecutions elsewhere, is no reason for us to oblige, especially when the result is to subvert existing local law. In the process, the Court reverses the conviction of a wholesale narcotics violator with a previous record in the traffic who carries on his abominable trade by using a juvenile as his dope peddler and co-conspirator.

The facts on which the Court of Appeals found the entry valid were these: Officers trailed Shepherd as he proceeded by taxicab to purchase heroin for Lewis, a narcotics agent. Shepherd went to the apartment occupied by his sister, Mrs. Byrd, and by petitioner. The officers saw him enter the apartment building. Agent Wilson followed him to the basement entrance and saw him disappear down a lighted hall about "as long as the jury box." Other than the entrance, there were only two

---

concerns entry to execute a search warrant. It is important to note, however, that certain language, set out in italics above, is peculiar to the local "judicially developed" rule. The latter is not respected in the interpretation of § 3109 by the Court today.

[2] While the Government in its brief agrees "that the validity of the entry should be tested under the standard of 18 U. S. C. 3109," it joins that position with the contention that "[u]nder these circumstances, [the police] entry complied with the teaching accepted in *Accarino* v. *United States* [85 U. S. App. D. C. 394, 401], 179 F. 2d 456, 463." See note 1, *supra*.

doors into the hall, one leading into petitioner's apartment, the other into a furnace room. No one lived in the basement except petitioner and Mrs. Byrd. Wilson then withdrew to a location across the street. He saw a light go on in the furnace room, remain on shortly, and then go out. Shepherd soon emerged, re-entered the taxicab and drove away. The officers followed, arrested Shepherd, and seized 100 capsules of heroin found in the taxicab.

The opinion of the Court of Appeals graphically described the subsequent events:

> "After the arrest of Shepherd, the officers, having found the 100 capsules of heroin, immediately went back to the apartment occupied by Mrs. Byrd and Miller, and, a few minutes later, knocked on the door and announced their identity. Thereupon Miller, known to the officers as a narcotics violator, having opened his door part way, recognized the officers of the narcotics squad and attempted to close the door. As he pulled the door to, the officers resisted his effort to close it, a chain bolt broke, and the officers arrested Miller and Mrs. Byrd." 100 U. S. App. D. C., at 304, 244 F. 2d, at 752.

This summary is amply supported by the evidence. Wilson testified that petitioner previously met him when he was an agent with the Federal Bureau of Narcotics. He also knew petitioner in connection with a narcotics case. Officer Wurms testified that he too knew petitioner officially.[3] As to their entry into the apartment, Wurms testified: "I knocked on the front door . . . somebody

---

[3] Q. "How did you know [Miller]?" A. "Previous knowledge, and I have seen him before." Furthermore, petitioner in his affidavit supporting his motion to suppress swore "that officers Wilson, Pappas and four others did break the chain off the door," and further that Wilson physically assaulted him in his apartment.

asked, 'Who's there?' I said, 'Blue'—in a low voice, I said 'Police.' I repeated it two or three times, in that manner. The door opened. There was a chain on the door. Blue Miller saw me, Agent Wilson, and I don't know who else he saw but he tried to close the door . . . ." Wilson described the entry this way: "There was a short struggle there between Wurms and Miller to open the door and finally the door was forced open and we got ourselves into the apartment." The officers found the marked currency and a carton of one thousand unfilled gelatin capsules. Three hundred and eighty-one such capsules filled with heroin were found in the furnace room across the hall.

At a pretrial hearing petitioner moved to suppress the marked currency, alleging that the officers had neither warrant nor probable cause for arrest. This motion was denied. At trial before a jury and a different judge the motion was renewed. In denying the motion, the judge said, "I will give you the right to make another motion. You certainly have a right at the end of the testimony." Petitioner never availed himself of this opportunity.

On appeal petitioner shifted his ground, emphasizing that even if the officers had probable cause to arrest him, such authority was improperly exercised because they did not formally announce their purpose before entry. The Court of Appeals held:

> "Against the background of the facts as noted and the law as summarized, we find the officers at Miller's door, knowing that a felony had been committed and having probable cause to believe it was continuing. The statute spelled out their clear duty to arrest." 100 U. S. App. D. C. 302, 309, 244 F. 2d 750, 757.

The court agreed with the trial judge "that the attempt of the officers to arrest Miller at his doorway under the circumstances of this case was not unreasonable," and found

that the breaking of the door chain "in the course of his resistance [was] immaterial and his arrest, immediately made, was justified." 100 U. S. App. D. C., at 310, 244 F. 2d, at 758. Concluding that Miller without doubt was aware both of the officers' identity and purpose, the court upheld the refusal of the trial court to suppress the evidence, and found the proof of guilt "overwhelming and unanswerable."

The majority, however, brushes aside these conclusions, explaining petitioner's action in slamming the door as "the expected reaction of any citizen." This is something entirely foreign to my concept of the respect a law-abiding citizenry pays to its law-enforcement officers. Nor can I accept the conclusion of the Court that the circumstances found by the Court of Appeals fall "short of a virtual certainty that the petitioner knew of [the officers'] purpose to arrest him." His knowledge—in the absence of an express admission by him—can never be a "virtual certainty." Rather than attempting to psycho-analyze petitioner, we should measure his understanding by his outward acts. The Court of Appeals found that they indisputably established petitioner's awareness of the police purpose. We should not disturb that finding.

The majority does not deal with the "exigent circumstances" of the case because the Government makes no claim for thus "excusing compliance" with the statute. It is to be noted, however, that the Court of Appeals expressly based its opinion on the fact that the officers "were confronted by the need for a decision arising from the necessitous circumstances of the situation." The position of the Government does not excuse us from evaluating the circumstances of the whole case. I believe that the Court of Appeals was eminently correct in its conclusion that "necessitous circumstances" here warranted the officers in entering the apartment. As that court pointed out, petitioner might have fled or hidden

himself or destroyed the fruits of his crime, particularly in view of his background and the visit of his brother-in-law Shepherd only a few moments before. Certainly he soon would have learned of Shepherd's arrest. Moreover, his attempt to forcibly prevent the entry of the officers into his apartment required their immediate action. Any delay might well have precluded the arrest. Destruction of the marked money might have prevented the establishment of petitioner's guilt. As the Government points out, "split-second action [was] necessary."

I would affirm the judgment on the basis of the District of Columbia rule in *Accarino, supra,* which I believe this Court should honor.[4]

---

[4] See *Fisher* v. *United States,* 328 U. S. 463, 476 (1946), where the Court said, "Our policy is not to interfere with the local rules of law which [District of Columbia courts] fashion, save in exceptional situations where egregious error has been committed."

In *Griffin* v. *United States,* 336 U. S. 704 (1949), the Court determined that there was no "federal rule" on the issue in the case. But it added that even if there were such a rule, it would not necessarily control in the District of Columbia: "This Court, in its decisions, and Congress, in its enactment of statutes, have often recognized the appropriateness of one rule for the District and another for other jurisdictions so far as they are subject to federal law." *Id.,* at 712. The Court noted that it was the "special function" of the Court of Appeals to decide questions of local law. "Only in exceptional cases will this Court review a determination of such a question by the Court of Appeals for the District." *Id.,* at 718.