**UNITED STATES of America**

**v.**

**Estella MURPHY and Willie Williams.**

**Crim. No. 524–59.**

United States District Court
District of Columbia.

July 11, 1959.

824

Oliver Gasch, U. S. Atty., and Joseph A. Lowther, Asst. U. S. Atty., Washington, D. C., for United States.

Howard D. Levine, Washington, D. C., for defendant Estella Murphy.

Alexander L. Benton, Washington, D. C., for defendant Willie Williams.

KEECH, District Judge.

This case is before the court on motions to suppress filed on behalf of the defendants Estella Murphy and Willie Williams, and a motion for severance on behalf of the defendant Williams only. The motions to suppress have been heard at substantial length, defense counsel having been accorded considerable lati-
tude in the examination of witnesses and full argument having been had.

After weighing the credibility of the various witnesses who testified, the court finds:

Prior to April 24, 1959, Detective Paul of the Metropolitan Police Narcotics Squad received information from the Federal Bureau of Narcotics that it had been maintaining surveillance of premises 2007 Klingle Road, N. W., in the District of Columbia, and had observed numerous narcotic addicts and peddlers frequent the premises, including convicted narcotics violators known to the police. Detective Paul was told by an unidentified informer, a narcotic addict, previously found to be reliable, that she had been purchasing heroin from the codefendant, Gloria Morton, known to her as "Big Gloria," at 706 Quincy Street, N. W.; that when she made a purchase, Gloria would leave the Quincy Street premises and go to Estella Murphy's to obtain the narcotics.

On April 24, 1959, Leoris Raimondi, an addict with a considerable record of misdemeanors and one narcotics violation conviction, was arrested on "investigation for narcotics", some time between eight and nine-thirty a. m. She stated that she wished to assist the Narcotics Squad of the Metropolitan Police. When interviewed by Detective Paul, she told him that she was purchasing her narcotics from Gloria Morton. She stated that when she made a buy she would call Gloria Morton at the Quincy Street address on the telephone; that Gloria would tell her to come over; that when she got to 706 Quincy, Gloria would ask what she wanted; that she would tell Gloria how many capsules and give her $1.50 for each capsule ordered; that then Gloria, after calling Estella Murphy on the telephone, would leave; that Gloria would be gone about an hour, and upon her return would give the narcotics to Leoris. Detective Paul had reason to believe in the reliability of this information from Leoris Raimondi, since it was corroborated by what he had been told by the other unidentified informer and by

the observations of agents of the Federal Bureau of Narcotics upon surveillance of 2007 Klingle Road.

Detective Paul, in his work with the Narcotics Squad, had already heard of Estella Murphy. He had checked the files and found that she had been convicted previously under the Harrison Narcotics Act. He also knew of Gloria Morton as a drug user.

Between 7:30 and 8 p. m., Detectives Paul, Longo, Didone, Panetta, and Bonaparte met in the office of the Narcotics Squad, where Detectives Didone and Longo dusted one $5 bill and ten $1 bills with fluorescent powder and made a list of the serial numbers of the bills. Thereafter, at about 8:30 p. m., they proceeded to the Women's Bureau, where they met Officer Goodrum and Leoris Raimondi. Officer Goodrum, a woman, searched Leoris for. narcotics and money and removed some money. Detectives Longo and Panetta, Officer Goodrum, and Leoris Raimondi left the Women's Bureau in Panetta's car, with Detectives Didone, Bonaparte, and Hood following in a police cruiser. At Georgia Avenue and Park Road, Leoris Raimondi left the car with Officer Goodrum and made a telephone call from an outside booth at a gas station. After her return to the car, the informer was given the $15 in marked money and one unmarked dollar bill to cover Gloria Morton's cab fare. They then drove to Eighth between Quincy and Randolph Streets, N. W., where the informer left the automobile, followed directly by Officer Goodrum. They crossed New Hampshire Avenue and walked east in the 700 block of Quincy Street, until out of the view of the officers in the car. Officer Longo left the automobile and went to a point from which he could observe premises 706 Quincy Street. At about 9:45 p. m., Detective Paul observed Gloria Morton come out of the 700 block of Quincy Street and walk to the corner of Georgia Avenue and Quincy Street, where she stopped a southbound taxicab and entered it. Detective Paul, with Detectives Panetta and Longo and Private Goodrum, followed the cab to 2007 Klingle Road, N. W., where Gloria Morton left the cab and entered the premises at about 9:55 p. m. At approximately 10:30 p. m. Gloria Morton left the premises. As soon as she arrived on the sidewalk a D. C. Transit bus came along, and she boarded it.

The officers followed the bus for a few blocks. Gloria Morton was the sole passenger. As she was looking around, they thought she might spot them, so they discontinued following the bus. They then drove back to the 700 block of Quincy Street, and passed through the block once, a prearranged signal, to inform Detectives Didone and Hood that Gloria Morton was on her way back to the house. They then drove around the square and parked in the 700 block of Quincy Street. At about 10:45 p. m. Detective Paul observed Detective Didone place Gloria Morton under arrest upon her return. At about 11 p. m. they all went back to the Women's Bureau, where Gloria Morton was searched. A paper containing a white powder and fourteen gelatin capsules, also containing a white powder, were removed from the top of her stocking. When asked what it was, she stated it was heroin. The officers then left the Women's Bureau and returned to the 700 block of Quincy Street about 11:15 p. m. Officer Goodrum went back to 706 and returned with Leoris Raimondi. Upon being asked what had transpired in the premises, she stated that after she knocked at the door, Gloria Morton admitted her to the premises; that Leoris told Gloria she wanted ten capsules of heroin and gave her the $15 in marked bills, plus the one unmarked bill for cab fare; that Gloria then went to the phone and called Estella Murphy; and that after the telephone conversation Gloria put on her coat and left the premises.

The officers took Leoris Raimondi to the Tenth Precinct, where she was again searched. The police then returned to 2007 Klingle Road, N. W., reaching there about 11:30 or 11:35 p. m. There De-

tective Bonaparte informed Detective Paul that no one had entered or left the premises during his absence.

Detective Hood with Officer Goodrum, both of whom were in plain clothes, went up to the front door of 2007. Detective Paul stood on the porch of premises 2009, next door. The other officers remained in the vicinity, some in the front and some in the rear of the house. Detective Hood knocked on the door and rang the bell off and on for from three to five minutes. No one came to the door. He and Officer Goodrum waited, continuing to ring the bell. Finally the lights came on in the hall and on the porch. Then, through the curtain at the glass in the door, Detective Hood observed the shadow of a woman come down the stairs in the hall and to the door. In a voice loud enough to be heard by Detective Panetta, who was then three doors away, Detective Hood announced that it was the police. The woman asked whom he wished to see, and he answered that he wanted Estella Murphy. At that time he was holding up against the glass of the door his credential folder, bearing his picture and the words "Metropolitan Police Department, Washington, D. C.", in large capital letters, followed by a certification in small print that the officer was a detective with the Department. When the woman parted the curtains on the door, Detective Hood recognized Estella Murphy, whose appearance he knew. She came close to the glass, almost touching it, and looked, but when she saw the police credentials she turned and ran from the door and up the stairs leading to the second floor. At one point she slipped, but regained her footing and ran on up. Meanwhile, when Detective Hood saw the defendant Murphy turn and run, he attempted to push the door in with his shoulder. His first attempt was unsuccessful. He was then joined by Detective Paul, who had leaped over the porch railing of premises 2009; and the two officers pushed in the door with their shoulders, breaking the lock. They rushed in and followed defendant Murphy up the stair. Detective Paul, passing Hood,

caught up with defendant Murphy at the top and placed her under arrest as soon as he reached her. At the time she had in her hand a brown paper bag containing four hypodermic needles. The entry occurred about 11:35 or 11:40 p. m.

When he reached the second floor, Detective Hood heard someone making a noise inside a bathroom at the top of the stair. He and Detective Paul looked in through the open bathroom door and saw the defendant Williams, seated on the commode, with the lid down. Williams was fully clothed, with an overcoat and hat on, and was moving his hands rapidly behind him where the flush lever should have been. Estella Murphy's twelve-year-old daughter was standing in the bathtub, half clothed. Detectives Hood and Paul, the latter having turned the defendant Murphy over to Officer Goodrum and Detective Didone, entered the bathroom and immediately placed Williams under arrest.

Thereafter, Officer Hood raised the lid, looked into the bowl of the commode, and found two glassine bags containing a quantity of white powder. Defendant Williams was taken into the front bedroom, where defendant Murphy already had been taken by Detective Didone. The marked $5 bill and ten $1 bills were recovered from Williams' pocket. The hands of both defendants showed traces of fluorescent powder on being tested with an ultra-violet lamp which the police had brought with them. The defendant Murphy stepped behind a dresser, pulled up her dress, and removed from the top of her stocking two packages, one containing a quantity of loose white powder and the other containing a quantity of capsules, which she turned over to Detective Didone.

Defense counsel seek to quash the arrests, which were admittedly without either search or arrest warrants, as not being grounded on probable cause and as the fruit of an unlawful invasion of a dwelling house at a late hour of the night, by breaking in, when there was no necessity of the moment. Counsel liken the entry and arrest in the instant case

to those condemned in Accarino v. United States, 85 U.S.App.D.C. 394, at page 402, 179 F.2d 456, at page 464, in which it was stated:

"* * * Unless the necessities of the moment require that the officer break down a door, he cannot do so without a warrant; and if in reasonable contemplation there is opportunity to get a warrant, or the arrest could as well be made by some other method, the outer door to a dwelling cannot be broken to make an arrest without a warrant. The right to break open a door to make an arrest requires something more than the mere right to arrest * * *."

Counsel argue further that, even if it be held that there were necessitous circumstances which justified a breaking, the arrests still would be unlawful for failure of the police to comply with the procedure required under Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332, in which it was held that an officer may break open a door to make an arrest without a warrant only if, after notice of his authority and purpose, he is denied admittance.

After reviewing all the facts and circumstances surrounding the two arrests and the searches subsequent thereto, the court concludes:

■ (1) When the police went to 2007 Klingle Road, N. W., they had probable cause to arrest Estella Murphy for felonies, namely, violations of the federal narcotics laws by the sale to Gloria Morton and by possession of a supply of narcotics. This being so they had the right to arrest her without a warrant.

■ (2) When Officer Hood rang the bell, loudly announced that it was the police and that he wanted Estella Murphy, exhibiting his police credentials through the glass of the door to the defendant Murphy, whom he recognized, he complied with the procedure approved in Miller v. United States, supra. Even if it should be considered that he did not announce clearly that the purpose of his visit was to arrest Estella Murphy, it would have been useless for Officer Hood to explain any further, since the defendant Murphy ran from the door and up the stairs upon seeing his police credentials. In the Miller opinion, 357 U.S. at page 310, 78 S.Ct. at page 1196 the Supreme Court recognized:

"* * * It may be that, without an express announcement of purpose, the facts known to officers would justify them in being virtually certain that the petitioner already knows their purpose so that an announcement would be a useless gesture * * *."

Here, the defendant Murphy's action in running immediately upon being apprised of the presence of the police a short time after an illicit sale of narcotics by her, demonstrated full awareness of their purpose and made any further announcement useless.

■ As to the making of the arrest without a warrant at a late hour of the night, the police did not have sure grounds upon which to arrest the defendant Murphy for the sale or possession of narcotics until about 11 p. m., when Gloria Morton was searched at the Women's Bureau and narcotics were found on her. At that hour no magistrate was readily available to issue either an arrest or a search warrant, nor was a magistrate required to be available at such hour. Porter v. United States, 103 U.S.App.D.C. 385, 258 F.2d 685.

The police are to be commended for waiting to make an arrest until after they had obtained sufficient evidence to support a prosecution and conviction.

In this case, there were circumstances which justified dispensing with a magistrate's arrest warrant. To paraphrase Johnson v. United States, 333 U.S. 10, at page 15, 68 S.Ct 367, 369, 92 L.Ed. 436: Although no suspect was fleeing or likely to take flight and the arrest was made in permanent premises, not in a movable vehicle, "evidence or contraband *was* threatened with removal or destruction." Indeed, the reality of the threat

828

of destruction of the contraband was demonstrated by the defendant Williams' unsuccessful efforts to dispose of that which was in his possession, foiled only by plumbing which was out of order. Under similar facts, an arrest without a warrant after an entry without breaking and the search incident thereto were held valid by the Court of Appeals of this circuit in Smith v. United States, 103 U.S.App.D.C. 48, 254 F.2d 751, certiorari denied 1958, 357 U.S. 937, 78 S. Ct. 1388, 2 L.Ed.2d 1552.

Upon all the facts and circumstances, the court therefore holds that the entry by breaking was lawful.

■ (3) Having lawfully entered, the police immediately arrested the defendant Murphy as soon as they could catch her. As an incident to her arrest they had a right to make a reasonable search thereafter not only of her person but also of the premises, for instrumentalities and means by which the crime was committed, the fruits of the crime, and property the possession of which is a crime. Harris v. United States, 331 U.S. 145, 154, 67 S.Ct. 1098, 91 L.Ed. 1871. The articles taken from her person and from her premises, all of which were obtained after her lawful arrest, were therefore validly seized.

■ (4) As to the arrest of the defendant Williams, the whole background, as well as all the circumstances of his presence in the bathroom, a part of the premises which the officers had a right to search following their arrest of Estella Murphy, were such as to give police officers familiar with the narcotics traffic reasonable ground to believe he too had committed or was committing a felony, namely, the possession of narcotics. His immediate arrest was therefore lawful, and the seizure of marked money found in Williams' pocket was a lawful incident to such arrest.

■ (5) The seizure of the narcotics from the bowl of the commode after Williams' arrest was valid as incidental to the arrest of either the defendant Murphy, owner of the premises, or the defendant Williams, who had the narcotics in his constructive possession at the moment of his arrest.

For the foregoing reasons the court denies the two motions to suppress.

The defendant Williams having made no showing of prejudice which would justify the granting of severance, the court also denies the motion for severance filed in his behalf.