UNITED STATES of America,

v.

James J. CALLY, Edwin K. Lumpkin, Bryan W. Newkirk, Abraham Silinsky and Leslie E. Wetmore, Defendants.

No. 65 Cr. 331.

United States District Court
S. D. New York.

Oct. 17, 1966.

Robert Kasanof, New York City, for defendant Silinsky.

Robert M. Morgenthau, U. S. Atty., S. D. N. Y., by Peter E. Fleming, Jr., Asst. U. S. Atty., for the Government.

CANNELLA, District Judge.

Defendant Abraham Silinsky's motion, pursuant to Fed.R.Crim.P. 41(e), for the suppression as evidence and return of a potpourri of personalty taken from his home by special agents of the Intelligence Division of the Internal Revenue Service at the time of his arrest on April 27, 1965, is granted and the Government is hereby directed to return forthwith to the defendant all of the personalty seized, including any reproductions thereof, which it might still possess.[1]

On April 9, 1965, a six count indictment was returned charging Abraham Silinsky and four co-defendants,[2] the latter two of whom are Canadian nationals, with (a) a conspiracy in violation of 26 U.S.C. §§ 7201, 7203 and 7206 to obstruct the Internal Revenue Service (hereinafter the "I.R.S") in the collection of its taxes beginning in 1956 and continuing until the date of the indictment; and, (b) five counts of substantive crimes against the tax laws of the United States.

Silinsky was named in the second and third counts of the indictment, as well as the conspiracy count. In general, the indictment concerns a joint enterprise and partnership entered into by the five named defendants for the purpose of selling stock in certain Canadian mining corporations. The second count charges that during the calendar year of 1958 this joint enterprise and partnership had a joint income in excess of $2 million and that Silinsky failed to report his distributive share in an attempt to evade the payment of the individual income tax due and owing on that share. The third count charges that Silinsky filed a false return for the calendar year of 1958 and that he subscribed that tax return under the penalties of perjury, knowing that it was not true and correct as to every material matter.

On the date of its return the indictment was sealed and bench warrants were issued as to each of the five defendants. Four of the five bench warrants eventually went unexecuted as Cally and Lumpkin answered the indictment by summons and Newkirk and Wetmore, the Canadian nationals, have not submitted to the jurisdiction of this court. On the other hand, on April 27, 1965, the bench warrant citing Silinsky was executed in his apartment and in conjunction with the arrest, five agents of the I.R.S. made a thorough search of his entire apartment seizing the miscellania which forms the subject matter of this motion.

The petitioner bases his motion on three contentions: (1) that the arresting officers took him into custody in his apartment as a pretext for an unconstitutional search of that apartment; (2) that the scope of the resulting search exceeded permissible limits in that it was a general exploratory search, seeking in reality to obtain evidence and therefore unreasonable; and (3) that the articles seized were not susceptible to seizure

---

1. Although the evidentiary hearing on this motion was held on October 29 and November 1, 1965, it was not until the week of September 26, 1966, that the Government and the defendant submitted to the court their final memoranda and reproductions of the items seized.

2. James J. Cally, Edwin K. Lumpkin, Bryan W. Newkirk and Leslie E. Wetmore.

even during the course of a lawful search, as they were evidentiary only and were neither contraband nor instrumentalities of a crime.

In light of the disposition made of this motion, the third contention of the defendant will not be discussed.

## I. *The Legality of the Arrest*

The thrust of Silinsky's initial contention is that as the warrant for arrest was issued on April 9th but was not executed until April 27th, and since he was admittedly under a surveillance for a time on April 26th, the arrest in his home was a deliberate ploy by the arresting officers to effect a search of the apartment as incidental to an arrest. This argument is tenuous at best.

■ Delay by law enforcement officers in arresting a suspect ordinarily does not affect the legality of the arrest. Unfortunately, it is true that "every time there is a delay in the making of an arrest and there is a search made as incidental to the arrest, the law enforcement officers take the risk that they will be charged with using the arrest as a mere pretext for the search." Carlo v. United States, 286 F.2d 841, 846 (2d Cir.), cert. denied, 366 U.S. 944, 81 S.Ct. 1672, 6 L.Ed.2d 855 (1961). Notwithstanding this danger, however, law enforcement officers must, in the intelligent exercise of their duties, "wait in the hope that they may strengthen their case by ferreting out further evidence or discovering and identifying confederates and collaborators." Carlo v. United

States, supra at 846. See also United States v. Holiday, 319 F.2d 775 (2d Cir. 1963); United States v. Lane, 230 F. Supp. 950 (S.D.N.Y.1964). In this case the court finds as a fact that the agents had a legitimate reason to put off making the arrest. It was the expressed [3] hope of the Government that by delaying execution of the arrest warrants the two Canadian defendants, Newkirk and Wetmore, would enter the jurisdiction and be apprehended.[4] And, moreover, it was for this very reason that the indictment was ordered sealed upon its return by the Grand Jury and border stops were placed with United States Customs on Newkirk, Wetmore and Lumpkin, whose whereabouts at the time were unknown. When the statute of limitations had run, the warrant for Silinsky's arrest was ordered to be executed.[5]

In McKnight v. United States, 87 U.S. App.D.C. 151, 183 F.2d 977, 978 (1950), the case upon which the defendant principally relies, the court held that where the police admittedly reject a "convenient present opportunity" to make a lawful arrest and instead deliberately wait until the person enters his house, so that they can break in, make the arrest, and search the house "incidental to" the arrest, there is a violation of the Fourth Amendment. The propriety of this result in the light of the circumstances of that case cannot be seriously questioned. Those circumstances—or even similar circumstances—do not exist in our case, however. While it is true that the agents could have arrested Silinsky on the 26th

---

3. Transcript of the minutes of the evidentiary hearing held on this motion on October 29 and November 1, 1965 (hereinafter referred to as "Minutes"), pp. 50–51, 115–16.

4. This expectation was based on the fact that the statute of limitations for the alleged violations would expire on April 15, 1965, and that this event would cause Newkirk and Wetmore to cross the Canadian border "to determine what if anything had happened as a result of the investigation which both men knew was going on in New York City." (Minutes, pp. 115–16.)

5. The original date when the warrant was sought to be executed by the Assistant United States Attorney charged with the prosecution of this indictment was "the latter part of the week of April 26, 1965." Other assignments of the agents made that impossible, however, so it was decided that Silinsky would be taken into custody "as soon as possible on Tuesday, April 27, 1965." (Minutes, p. 117.) No site for the arrest was indicated to the agent.

of April when he was observed to be returning to his apartment, the fact that they did not seems to abnegate the defendant's argument. If the Government's purpose were to make, in effect, an arrest incidental to a search, it would seem that the agents would have arrested Silinsky at a time when they knew for sure that he was in the apartment, i. e., April 26th, or, alternatively, would have established a constant surveillance on the apartment to insure Silinsky's presence when the arrest was made on the following day. As the agents' surveillance was discontinued at approximately 8 p.m. on the evening of the 26th and was not resumed until approximately 7:30 a.m. on the morning of the 27th, the agents could not be sure that Silinsky was still in his apartment when they were going to execute the arrest warrant. The suggestion is compelling that the arrest was made for the arrest's sake and not for the sake of an incidental search.

McKnight v. United States, supra, on its facts, moreover, is readily distinguishable. In McKnight v. United States, supra at 977–978, it was noted by the court that McKnight was "repeatedly" trailed, that the Government conceded that "they purposely refrained from arresting (McKnight) in the street" and that "the officers *were given orders* not to arrest McKnight until he had entered the house." (Emphasis supplied.) None of these consequential factors exist in our case, however. Silinsky was not "repeatedly" under surveillance but was, in fact, observed only on the prior day "to ascertain the whereabouts of Mr. Silinsky."[6] Also, the arresting officers were not "given orders to arrest until he had entered the house" for the place of arrest was not specified by the Assistant United States Attorney.[7] And neither do the teachings of United States v.

Alberti, 120 F.Supp. 171 (S.D.N.Y.1954) compel a different conclusion.

With the foregoing in mind, therefore, this court finds that the arrest was a valid, constitutional arrest and was not a mere pretense for making an improper search of the Silinsky apartment.

## II. *The Legality of the Search*

As noted above, the second contention of the moving defendant is to the effect that the scope of the resulting search, even assuming the arrest to be valid, exceeded the permissible limits in that it was exploratory in nature and for the purpose of obtaining evidence and was therefore unreasonable.

This claim cannot be judged intelligently apart from the circumstances leading up to the arrest and the nature of the search itself for the mere fact that a search immediately follows a valid arrest in point of time does not conclusively establish the reasonableness of the search. Abel v. United States, 362 U.S. 217, 235, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); United States v. Rabinowitz, 339 U.S. 56, 65–66, 70 S.Ct. 430, 94 L.Ed. 653 (1950). It thus becomes necessary to recite these matters in considerable detail.

On April 27, 1965, five agents of the I.R.S.,[8] armed with a sledgehammer and a crowbar and acting under the authority of an arrest warrant, but without a search warrant, went to Silinsky's apartment and there took him into custody. Following the arrest, which actually occurred in the bedroom, what must be characterized as a thorough and intensive general exploratory search of the entire apartment was undertaken.[9]

During the search which lasted for approximately 45 minutes and which resulted in the seizure of more than two

6. Minutes, p. 47.

7. Minutes, pp. 54, 117.

8. Agents Israel, Cayson, Villines, Namorato and Levy. All but agent Levy entered the apartment at the same time; agent Levy entered approximately five to ten minutes after the others.

9. The apartment here involved consisted of a living room, bedroom, dining room, dressing room, foyer, den, kitchen and bathroom. Agents Israel and Cayson searched the bedroom; agents Vellines and Namorato searched the living room, dining room and kitchen; and agent Levy searched the den.

hundred items, the individual agents who conducted the search attempted to segregate the relevant objects of their search from the extraneous material. The intensity of the winnowing ' out process varied from a superficial attempt [10] to a failure "to take the time to read them." [11] A third agent described the search as a "general search of the bedroom area * * * (with) * * * other agents (conducting) a general search of the rest of the apartment." [12] Deciding that the seized object had met the standard of relevancy, the agent would place the material in a container envelope marked for the location from whence the material came. Thereafter, the envelope was turned over to agent Cayson or to agent Israel, the supervising officers on the assignment. At some later, unspecified time, the contents of the envelopes were transferred to the envelopes in which they appeared in court.

Three of the agents who took part in this search appeared at the hearing held on this motion on October 29 and November 1, 1965, and testified that the object of their search was to uncover "confirmation slips, bank statements, brokerage accounts in names other than Mr. Silinsky;"[13] "the means of committing the crime that he was charged with, which was income tax evasion, and also for any fruits of the crime that we might find;"[14] "confirmations and bank statements and those sorts of materials which could be the means and instrumentalities of * * *;"[15] and, "the means of, instruments of committing a financial crime."[16]

■ Once again we are concerned with the interplay between the Fourth Amendment, which provides in pertinent part that the people "are to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and the Fifth Amendment

which provides in pertinent part that "no person * * * shall be compelled in any criminal case to be a witness against himself * * *." Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). It reflects a dual purpose—protection of the privacy of the individual, his right to be let alone and protection of the individual against compulsory production of evidence to be used against him. Boyd v. United States, supra; Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). See also Oklahoma Press Pub. Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946).

■ If the searches which produced these papers for the Government were constitutionally infirm, then whatever the nature of the seized articles, and however proper it would have been to seize them during the course of a proper search, they will have to be suppressed as the fruits of an activity in violation of the Fourth Amendment. Weeks v. United States, supra, 232 U.S. at 393, 34 S.Ct. 341. If, alternatively, the circumstances of the search were not repugnant to the spirit of the Fourth Amendment then these documents which were used as a means to commit the crime involved are the proper subjects for a search, Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921), and are seizable when discovered in the course of a lawful search, Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927).

In 1959 the Supreme Court stated that its decisions in the area of search and seizure "cannot be satisfactorily reconciled" and that the "problem has * * * provoked strong and fluctuating differences of view on the Court." Abel v. United States, 362 U.S. 217, 235, 80 S.Ct. 683, 695, 4 L.Ed.2d 668. That same decision instructed that Harris v. United

---

10. Minutes, p. 45.

11. Minutes p. 70.

12. Minutes, p. 90.

13. Minutes, Testimony of agent Israel, p. 59.

14. Minutes, Testimony of agent Israel, p. 48.

15. Minutes, Testimony of agent Levy, p. 77.

16. Minutes, Testimony of agent Cayson, p. 96.

States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), and United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), set "by far the most permissive limits upon searches incidental to lawful arrests." Abel v. United States, supra, 362 U.S. at 235, 80 S.Ct. at 695.

The threshold question thus presented is whether, in light of the current line of the relevant Supreme Court decisions and this Circuit's interpretations thereof, any search (without considering its extent) was proper and lawful. One was, as incidental to an admittedly lawful arrest. In this case there was no evidence of an unlawful entry into premises, Gouled v. United States, supra, or of a forced entry, Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), or of an entry by subterfuge, Leahy v. United States, 272 F.2d 487, 489 (9 Cir. 1959) or a previously unauthorized entry, United States v. Alberti, 120 F.Supp. 171 (S.D.N.Y.1954).

The question is thus reached of whether the search extended beyond the area of reasonableness, i. e., was the search made within the limited permissible bounds incident to a lawful arrest?

█ It is, of course, patent that only unreasonable searches are prohibited by the Fourth Amendment. United States v. Rabinowitz, supra, 339 U.S. at 60, 70 S.Ct. at 432. The right to search the *person* after a valid arrest "always has been recognized in this country and in England." How much further may the search go? Unfortunately, a "reasonable search is not to be determined by any fixed formula. The Constitution does not define what are 'unreasonable' searches and, regrettably, in our discipline we have no ready litmus-paper test. The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case." United States v. Rabinowitz, supra at 63, 70 S.Ct. at 434, citing Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931).

██ The mere fact that the Government has sufficient time to procure a search warrant but failed to, as in our case, is not determinative of the reasonableness of the search. Under no circumstances is the procurement of a search warrant to be "crystallized into a *sine qua non* to the reasonableness of a search." United States v. Rabinowitz, supra, 339 U.S. at 65, 70 S.Ct. at 435. But it is a factor to be considered in evaluating it. If this factor, however, when added to the totality of the circumstances of the case indicated that the true purpose of the arrest was to justify a general exploratory search for evidence and was not to apprehend Silinsky, the search would be unreasonable. United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932).

█ In light of the foregoing considerations and their application to the circumstances of this case it cannot be reasonably said that the search was a reasonable one made incidental to a valid arrest. Rather, it appeared to be a general "rummaging of the place", a practice which is condemned by our Constitution as explained by Go-Bart Importing Co. v. United States, supra and United States v. Lefkowitz, supra.

A brief mention of only a few of the more troublesome facts of this case will suffice to show the correctness of this conclusion.

Firstly, there is a lapse of approximately five or six years between the alleged commission of the crime and the time of the search. Actually, little needs to be said about this circumstance for it is one of the more patently egregious factors in the case. Suffice it to say that the thought of an individual being subjected to as intensive a search of his home as was involved here for an offense which was alleged to have occurred more than five years earlier and that such a search would have the sanction of the courts is indeed disturbing. If such a passage of time were to be permitted it would be difficult, if not impossible, to draw a meaningful distinction between valid warrantless searches and warrant-

less searches which, like searches with warrants, had lost their vitality as a result of the passage of an unreasonable length of time.

The number of arresting agents involved in this case is similarly disturbing. It stretches the imagination to believe that five officers were needed to arrest a single 68 year old man suspected of having committed the non-violent and weaponless crime of tax evasion. The suggestion is compelling that at least the secondary object of the officers was to search the Silinsky home and was not to apprehend Silinsky.

The thoroughness and intensity of the search involved cannot pass without some mention. It would be pointless to review the decisions which discuss the permissible area of search—a topic which necessarily includes the thoroughness and intensity of the search. Obviously, each case will turn on the nature of the crime, in that the crime will determine the product sought which, in turn, will determine the permissive area of search. This is not to say, however, that because the object of the search is something that can be handily concealed the searching agents have *carte blanche* to enter the most private of rooms in a home and thoroughly search every drawer in a piece of furniture to be found therein.[17] When one agent referred to the search as a general search of the entire apartment[18] and the other agents corroborated it by their own testimony, the search was aptly, if fatally, described. See also Kremen v. United States, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876 (1957).

Moreover, despite the overruling of Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948), by United States v. Rabinowitz, supra, 339 U.S. at 65–66, 70 S.Ct. 430, in so far as the former held that a search warrant was required solely on the basis of the practicability of obtaining one rather than upon the reasonableness of the

search after a lawful arrest, the failure to procure a warrant where, as here, it was practicable to do so is *a* significant factor which may still be considered in determining the reasonableness of the search. Further, the compelling reason stressed in United States v. Rabinowitz, supra at 65–66, 70 S.Ct. 430, for permitting the arresting officers to judge when the arrest is to be made is not present in this case for it was decided at an earlier date just when the arrest was to be made.[19]

This court holds, therefore, that the search of Silinsky's apartment was improper in that it exceeded common standards of reasonableness applicable to warrantless searches. Accordingly, Silinsky's motion to suppress that personalty which was seized as a result of the search must be, and hereby is, granted.

So ordered.

17. Minutes, p. 42.

18. Minutes, p. 90.

19. See, for example, Minutes, p. 53.