**UNITED STATES of America, Plaintiff,**

v.

**Charles Wallace NOLAN, Jr., Defendant.**

**No. 81–136 Cr.**

United States District Court,
W. D. Pa.

Dec. 3, 1981.

---

8. In fact, plaintiff was promoted during the 15-year period.

Michael A. C. Cauley, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

H. David Rothman, Frederick R. Nene, Pittsburgh, Pa., for defendant.

## OPINION

TEITELBAUM, District Judge.

### I.

The defendant, Charles Wallace Nolan, Jr., has been charged in a seven count indictment with various violations of the federal drug laws. As is typical in such cases, the defendant has filed a number of pretrial motions, including a motion to suppress physical evidence. On September 28, 1981, this Court ruled on all the pretrial motions and indicated that explanations for those rulings would be the subject of further opinions. By Opinion dated October 1, 1981, the Court explained its rulings on all the pretrial motions except the motion to suppress physical evidence. It is the explanation of the ruling on the motion to suppress which now concerns the Court.

### II.

On September 9, 1980, Special Agent John M. Guseman of the Drug Enforcement Administration received a tip from Shipley Patrick Danko. Mr. Danko said that Charles Nolan was rumored to be in the general Pittsburgh area and that when Mr. Nolan had been in the area on prior occasions he stayed in motels in Belle Vernon, Pennsylvania. Agent Guseman relayed this information to Inspector Paul Pongrace of the United States Marshal's Service. Inspector Pongrace had an arrest warrant issued nearly two years earlier, on October 3, 1978, by the United States Parole Com-

mission for Mr. Nolan's arrest for federal parole violations. Mr. Nolan was on parole following a previous conviction in Federal District Court in Kansas for importation of marijuana. Inspector Pongrace, as an officer in the United States Marshal's Service, was vested with the statutory obligation and responsibility to locate parole violators. He pursued the tip he received from Agent Guseman by traveling to Belle Vernon with another officer from the Marshal's Service, Deputy Holland. They took along the arrest warrant and a photograph of Mr. Nolan.

In Belle Vernon, they began to canvass the various motels in an effort to locate Mr. Nolan. At each motel the inspector identified himself, showed the motel manager or desk clerk the photograph of Charles Nolan, and asked if he or she could identify the person depicted in the photograph. At one motel, the 5M Motel, the inspector was told that person in the photograph was known as Rocco Favorite, and that he had most recently stayed at the motel in June of 1980. Visits to some other motels were uneventful.

Inspector Pongrace arrived at the Motel 6 around 2:00 P.M. There he was told by Mrs. McSpadden, the desk clerk, that the person in the photograph was known as Rocco Favorite and more importantly, the inspector was told that "Mr. Favorite" was currently registered at the motel in Room 48. Mrs. McSpadden also stated that "Mr. Favorite" had reregistered at 12:30 P.M. for an additional night, that he appeared to return to his room thereafter, that she had not seen him leave his room, and that on prior stays he spent a great deal of time in his room.

Inspector Pongrace and Deputy Holland proceeded to Room 48; a room with two windows, on the ground floor, at the rear of the motel. They observed that the door to Room 48 was less than twenty feet from the rear exit of the motel and that the

parking lot was next to the rear exit. The officers noted that the door to Room 48 was made of steel and that the lock on the door appeared to be a type of security lock that prevented anyone without a special master key from inserting a key completely into the lock to unlock the door from the outside when a button was depressed on the inside of the door. Listening at the door, the officers heard the sounds of television or a radio.

Inspector Pongrace was also aware that state police, while investigating the fatal shooting of a state police officer on June 13, 1979,[1] found an address in Canada for Charles Nolan in the wallet of a suspect in that shooting. While Inspector Pongrace did not know how closely, if at all, Charles Nolan was acquainted with the suspect in the shooting, he did know that the address in Canada had been confirmed as the address of Charles Nolan.

After hearing the television or radio in Room 48, Inspector Pongrace returned to the front desk of the motel for a passkey. Mr. McSpadden, the manager, returned to the door of Room 48 with the inspector. When they arrived at the door, Inspector Pongrace instructed Mr. McSpadden to knock on the door, say, "manager," put the key in the lock, unlock the door and with the inspector's assistance open the door. Mr. McSpadden was also instructed to remain as far out of the way as he possibly could. Mr. McSpadden followed the instructions of the inspector in the sequence listed. From the time of the initial knock until the door opened almost no time elapsed. As the door opened, Inspector Pongrace and Deputy Holland entered the room and simultaneously identified themselves. They proceeded immediately to the center of the room, looked into the bathroom, determined that no one was present and quickly exited leaving the room exactly as they had found it. The marshal's stay in

1. Neither Inspector Pongrace nor Agent Guseman, the government's two witnesses at the suppression hearing, were able to recall the date on which this shooting occurred. There is no dispute that a shooting did occur. This date was provided in defendant's brief. For purposes of the motion to suppress, this Court is willing to accept this uncontested representation as accurate.

the room was no more than thirty seconds. They observed that the television was on, and that several syringes, some spoons with powder on them, a bottle labelled "lactose," and a foil and cellophane packet with powder on the cellophane lay upon a table.

After leaving the room, Deputy Holland endeavored to watch for Mr. Nolan's return and yet avoid being recognized as a law enforcement official. Inspector Pongrace made two brief phone calls requesting additional manpower. He called his own office and as a result Chief Deputy Morphy and Deputy Smaltz were dispatched to Belle Vernon. In addition, Inspector Pongrace called Agent Guseman, who the inspector knew was interested in Mr. Nolan in connection with an investigation of narcotics trafficking. The inspector told Agent Guseman that he had a solid lead on Charles Nolan and suspected the presence of narcotics. The inspector requested Agent Guseman to come to Belle Vernon with a twofold purpose in mind; obtaining additional manpower and the expertise of someone able to make positive field tests for the presence of narcotics. All the officers implicitly recognized the urgent need to create a more controlled environment for apprehending Charles Nolan,—i.e. one where they could positively identify him and cut off his avenue of escape before he saw them and fled. It was in recognition of this urgency that the phone calls were kept brief and the additional officers hurried to Belle Vernon.

At approximately 3:30 p.m., the additional marshals and Agent Guseman arrived at the motel. All the officers participated in a stakeout designed to arrest Mr. Nolan before he arrived in his room for the officers genuinely desired to avoid the difficulty of making a forced entry into the motel room through the steel door with the security lock and to avoid the possible destruction of the suspected narcotics during any interval while forcing their way in. Inspector Pongrace took up a position near the parking lot entrance, Agent Guseman was stationed in

the hallway above Room 48, and the other officers took up other various positions. At approximately 4:45 p.m., Inspector Pongrace identified Mr. Nolan as the sole occupant of an automobile entering the parking lot and the inspector started toward Room 48. Agent Guseman did not identify Mr. Nolan until he stepped out of the automobile which he parked next to the rear entrance of the motel. Agent Guseman proceeded down the steps, making efforts not to alarm Mr. Nolan by running. However, Mr. Nolan disappeared into his room before either Inspector Pongrace or Agent Guseman arrived at the door of Room 48.

Because the officers feared that Mr. Nolan might attempt to destroy the objects seen on the table by Inspector Pongrace, objects suspected to be narcotics and related paraphernalia, if they knocked and announced their authority and purpose, these well trained law enforcement officials decided to repeat the method that they had initially used to gain entry. Inspector Pongrace again had Mr. McSpadden knock on the door, say, "manager," put the key into the lock and unlock the door. As the door cracked open, Agent Guseman shouted, "police," and displayed his badge. Mr. Nolan's face was seen briefly at the door and the door began to swing closed because of pressure from the inside. The officers collectively pushed the door open, and engaged in a brief struggle to subdue Mr. Nolan. Mr. Nolan was handcuffed, told he was under arrest for violating parole and read his *Miranda* rights. The objects initially seen on the table during Inspector Pongrace's first entry remained on the table and were seized. Mr. Nolan and the room were searched. The search disclosed a number of items which the government intends to introduce into evidence.[2] Specifically, the search disclosed: 1) a foil and plastic wrap of material containing white powder in the defendant's sock; 2) a small plastic bag of white powder in a book; 3) two cards labelled "Singh's Emporium" in a wallet in an air travel bag; 4) an international driver's

2. While it is not essential for this Court to know what was seized, it is potentially significant to know where the objects were when they were seized.

license in the name of Rocco Favorite bearing a picture of Mr. Nolan in the travel bag; 5) a passport issued in the name of Harold Mathers containing Mr. Nolan's photograph and a biographical outline of the Mathers' family in the travel bag; 6) a birth certificate in the name of Harold Mathers which was zippered into a money belt that fell off Mr. Nolan's arm during the struggle; 7) and a piece of hashish was found in Mr. Nolan's pocket. This search was considered necessary because Mr. Nolan was going to be transported immediately to the Allegheny County Jail[3] for resumption of his sentence and the policies of that institution forbid a prisoner to carry a weapon or other items considered "contraband" by prison officials.[4]

### III.

#### A.

The defendant argues that the physical evidence located by the officers on his person, and in his motel room, should be suppressed because the officers did not knock, and announce their authority and purpose before their first entry. The defendant continues that the same defect also existed with respect to the second entry. Furthermore, the defendant contends that since the first entry was improper any reliance by the officers on knowledge gained during the first entry, particularly their observation of suspected narcotics and related paraphernalia, to justify their mode of entry on the second occasion to prevent the destruction of evidence constituted an improper use of "fruit of the poisonous tree."

In addition, the defendant suggests that the officers should have sought a search warrant after making their first entry. However, the defendant opines that any such warrant would be invalid since the officers lacked sufficient, untainted infor-

mation to establish probable cause to search the room. As no warrant was sought or issued, this Court finds no reason to comment on this argument. Finally, the defendant avers that the length of time from the issuance of the arrest warrant to its execution was *per se* unreasonable. However, the defendant admits that no case holds that a delay in executing an arrest warrant invalidated an arrest. This Court perceives no reason in law or in the facts of this case to rule otherwise. The most significant of the issues raised by the defendant are those relating to the no-knock entries undertaken by the officers. To these issues, the Court now turns.

#### B.

In arguing that the officers improperly made no-knock entries into the motel room, the defendant has not specified whether he is alleging a deviation from a constitutional, see *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) or a statutory requirement, see 18 U.S.C.A. § 3109. Since the resolution of the issues before this Court does not hinge on any distinctions between these two requirements (if indeed there are any such distinctions) the Court will analyze the defendant's arguments in light of the precise language set forth in section 3109. That section reads:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

■ The initial question before this Court is, under the circumstances here existing, whether the officers were required to comply with the requirements of section 3109. Resolution of this issue requires the

---

**3.** The U.S. Marshal's Service has a contractual arrangement with this institution to temporarily house federal prisoners.

**4.** Additionally, a search was conducted of Mr. Nolan's automobile. Whether or not that search was an appropriate effort to inventory

all Mr. Nolan's goods at temporary living quarters to avoid accidental losses, this Court need not determine because the prosecution has indicated that it does not intend to introduce any items taken from the automobile into evidence in its case-in-chief.

Court to consider four questions: 1) does section 3109 control execution of an arrest warrant; 2) is a motel room a "house" for purposes of section 3109; 3) is use of a passkey a breaking for purposes of that section; and 4) does the use of the passkey to unlock and open the door by the hotel manager, and not by the federal law enforcement personnel, avoid the necessity for compliance with section 3109? While Inspector Pongrace did not have a search warrant but rather an arrest warrant, this statute is relevant. In *Sabbath v. United States*, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968) the Supreme Court stated:

> The statute here involved, 18 U.S.C. § 3109, deals with the entry of federal officers into a dwelling in terms only in regard to the execution of a search warrant. This Court has held, however, that the validity of such an entry of a federal officer to effect an arrest without a warrant 'must be tested by criteria identical to those embodied in' that statute. *Miller v. United States*, 357 U.S. 301, 306 [78 S.Ct. 1190, 1194, 2 L.Ed.2d 1332] (1958); *Wong Sun v. United States*, 371 U.S. 471, 482–84 [83 S.Ct. 407, 414–15, 9 L.Ed.2d 441] (1963).

*Sabbath*, at 588, 88 S.Ct. at 1757. (Footnote omitted).

■ This Court is cognizant that section 3109 refers only to entering a "house", while the entry in the instant case was made into a motel room. However, that distinction seems to be without legal significance. In *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), the Supreme Court stated, "No less than a tenant of a house, or the occupant of a room in a boarding house, a guest in a hotel is entitled to constitutional protection against unreasonable searches and seizures." *Id.* at 489, 84 S.Ct. at 893. (Citations omitted). Moreover, this Court is sensitive to the Supreme Court's proscription of "grudging applications" of section 3109, *Miller v. United States*, 357 U.S. 301, 313, 78 S.Ct. 1190, 1197, 2 L.Ed.2d 1332 (1958). Additionally this Court is aware that other federal courts have applied this statute to judge the validity of entries into hotel and motel rooms, without need for discussion. *See, e.g., United States v. Montano*, 613 F.2d 147 (6th Cir. 1980) and *Munoz v. United States*, 325 F.2d 23 (9th Cir. 1963). Therefore, this Court finds that the type of inhabited dwelling is insignificant in evaluating the applicability of section 3109.

The third question was the subject of *Sabbath, supra*. In that case the Supreme Court held that the need to use any force no matter how slight, even turning the knob of an unbolted door, to enter a dwelling, made compliance with section 3109 compulsory. In a footnote the Court mentioned the similarity between the breaking needed for the common law crime of burglary and for section 3109. *Sabbath, supra*, 391 U.S. at 589–90 note 5, 88 S.Ct. at 1758 note 5.

■ The fourth question, whether the use of the passkey by the manager rather than the federal officers is significant is not the subject of any prior precedents. However, the result in *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) is relevant. In that case a hotel clerk told officers that the suspect was not in his room, and then the clerk proceeded to the room where he unlocked and opened the door for the police. *Stoner* did not involve application of section 3109; it seems, because the Supreme Court suppressed the evidence, instead of relying on the "plain view" the officers had from the hall into the suspect's room to admit the evidence, that the relationship between the officers and the clerk was significant. That same relationship exists in the instant case. Inspector Pongrace, like the police in *Stoner*, requested a passkey and had the door opened by a hotel employee as a result. This seems sufficient to warrant the conclusion that, whether the actual application of force was by a law enforcement official or by a private citizen acting in conjunction with law enforcement personnel, section 3109 controls the entry into the room. Additional support for this view exists in the statute itself, for breaking is justified not only to liberate oneself but also "a person

aiding him [a federal officer] in the execution of the warrant." It seems therefore that unless a common law exception to section 3109 vitiated the need to comply with that section, the marshals were obliged to comply with that statute prior to their initial entry into the room.

## C.

■ It is apparent from the record that on neither the first nor the second entry did the officers knock, identify themselves and their purpose *before* the door was unlocked and cracked open. It follows, *a fortiori*, that the officers did not wait for any response from occupants of the room before attempting to enter. Such a mode of entry constitutes a highly technical violation, but a violation nonetheless, of section 3109.[5] However, this does not end the Court's inquiry. It has frequently been held that the requirements of section 3109 need not be complied with if exigent circumstances exist. While no specific Supreme Court decision has squarely rested on an exigent circumstance exception, repeated discussion of such a possibility indicates that the concept of such an exception has received the tacit approval of the Supreme Court. *See, e.g., Payton v. New York*, 445 U.S. 573, 583, 100 S.Ct. 1371, 1378, 63 L.Ed.2d 639 (1980); *Sabbath, supra*, 391 U.S. at 591, 1759; *Ker, supra*, 374 U.S. at 39–40, 83 S.Ct. at 1632–1633 (opinion of Clark, J.); *id.* at 47, 83 S.Ct. at 1636 (opinion of Brennan, J.) The existence of an exigent circumstance exception has been recognized by the Court of Appeals for the Third Circuit in reliance on the Supreme Court's discussion of the issue. It was most recently elaborated on in *United States v. Kane*, 637 F.2d 974 (3d Cir. 1981).

In *Kane*, the Court of Appeals listed five situations that constitute exigent circumstances. The Court stated that exigent circumstances which excuse compliance with section 3109 exist when the officers have a reasonable belief that: 1) the persons within already know of the officers' authority and purpose; 2) announcement would place persons within in peril; 3) announcement would place the officer or his associates in physical peril; 4) announcement would create the danger of destruction of the evidence; or 5) announcement would lead to an escape of someone sought by the police.

■ In determining whether a belief is reasonable the Supreme Court has indicated only what is insufficient. In *Miller v. United States, supra*, the Supreme Court held that because the officers did now know to a "virtual certainty" that the occupant of the dwelling knew their purpose, the government could not rely on the existence of an exigent circumstance to justify breaking down the door. In *Sabbath, supra*, the Supreme Court held that the government's contention that announcement "might have" endangered the officers or an informant or "might have" led to the destruction of evidence was insufficient. This Court is unaware of any Supreme Court case considering what test should be applied in considering whether a belief that someone would escape was reasonable. In determining the reasonableness of the officers' belief that someone would escape, an appropriate test would be, would a reasonable person in like circumstances have shared the officers' belief that someone might escape. Like circumstances would include that the "reasonable person" is a skilled law enforcement officer. It is doubtful that the officer making an immediate decision should be held to standards imposed by a court after legal research and reflection.

## D.

■ Having established the existence of the exigent circumstance exception, and briefly noted the perimeters of that exception, it becomes the task of this Court to determine whether an exigent circumstance existed prior to the initial entry into the

---

5. The purpose for requiring the officers to execute an arrest warrant to knock, identify themselves and state their purpose before entering what was a vacant room, defies the imagination of the Court and seems to elevate form over substance. It is small wonder that such requirements cause the public to doubt judicial or legislative dedication to law enforcement.

room. This Court finds that Inspector Pongrace knew a) that Charles Nolan had reason to avoid the police—*i.e.* to avoid capture for parole violation; b) that Charles Nolan had successfully avoided capture for nearly two years; c) that part of Mr. Nolan's method of avoiding detection was to use aliases—including Rocco Favorite; d) that Mr. Nolan's conviction was for importing marijuana from a foreign country; e) that Mr. Nolan had previously stayed in temporary living quarters under assumed names; f) that Mr. Nolan had acquired an address in a foreign country, Canada, while a fugitive; g) that the motel room had three potential exits, one door and two windows; h) that parking was very close to the motel room; i) that the possibility existed that Mr. Nolan might not be in his room; j) that only two law enforcement officials were on the premises at that time; k) that it would take a great deal of time and effort to break down the steel door; l) that positions for two officers to observe the room without being detected by persons coming and/or going were unavailable; and, m) additional assistance was over an hour away, in Pittsburgh. Based on these facts it would be reasonable for a trained police officer in Inspector Pongrace's position to assume 1) that Mr. Nolan would be likely to try and escape; 2) that if he was in his room and tried to escape he would likely be successful in the short run because of the limited number of officers on the premises in relation to the potential number of exits and because of the relative proximity of the parking lot; and 3) if he was not in his room he would probably see them waiting for him and escape; and 4) that if Mr. Nolan escaped he would likely be successful in the long run through his use of aliases and transient living quarters and travel to foreign countries. Based on such circumstances, this Court concludes that an exigent circumstance, fear of escape, existed prior to the first entry. This Court also finds it of some significance, that despite having an exigent circumstance to permit noncompliance with section 3109, Inspector Pongrace still complied with the spirit of that law announcing his authority and purpose simultaneously with the entry. The Court finds that adhering to the spirit of section 3109 when technical compliance was impossible served the same ends that section 3109 was designed to advance: 1) protection of privacy; 2) mitigation of violence; and, 3) prevention of needless destruction of property by a forced entry. *United States v. Kane*, 637 F.2d at 977. Significantly, the brevity of the incursion and the decision not to seize the suspected narcotics in plain view further indicate the officers' efforts to conform to the spirit of section 3109.

### E.

■ There can be little question that in actually entering the room on the first occasion the officers had probable cause to believe that Mr. Nolan was in the room. The statements of Mrs. McSpadden established a solid possibility that Charles Nolan was in the room and any further confirmation that might have been deemed necessary was provided by the sound of the television. While Mr. Nolan was not in fact present, this does not negate the existence of probable cause to believe he was there prior to the entry.

■ When Inspector Pongrace and Deputy Holland entered Room 48, they observed items which they immediately suspected to be narcotics and related paraphernalia. These objects are admissible under the "plain view" rule of *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) for the officers were lawfully present, discovered these objects inadvertently and the evidentiary nature of the objects was immediately apparent.

### F.

Since the government has indicated that it intends to introduce more than the limited number of objects observed on the first entry into evidence, the Court must also consider the legitimacy of the second entry into Room 48. Two significant factual developments distinguish the second entry from the first. One change was that the officers now had reason to believe that

Room 48 contained narcotics and related paraphernalia, substances capable of easy destruction. Secondly, three additional law enforcement officers had arrived to assist the two officers who were initially on the scene. This last factual development provided a sufficient number of officers to remain hidden from view but still watchfully await Mr. Nolan's return. Moreover, this number of officers was now able to cut off all of Mr. Nolan's potential avenues of escape. Thus, the chances of a successful escape by Mr. Nolan were so reduced as to no longer amount to a significant possibility. Ergo, the exigent circumstance rooted in the possibility of escape evaporated. *See, People v. Rogers*, 59 Ill.App.3d 396, 16 Ill.Dec. 902, 904, 375 N.E.2d 1009, 1011 (1978) and *People v. Polito*, 42 Ill.App.3d 372, 355 N.E.2d 725 (1976) (both considering and rejecting existence of exigent circumstances to avoid compliance with knock and announce rule of *Ker v. California, supra*, when police had large dwelling with many doors and windows surrounded).

■■■ While the arrival of additional officers acted to end one exigent circumstance justifying noncompliance with section 3109, the officers' observation of the suspected narcotics provided. the essential factual predicate to another exigent circumstance—*i.e.* reasonable belief that compliance with section 3109 would lead to the destruction of evidence. Inspector Pongrace knew [6] a) that Mr. Nolan was a fugitive with a prior drug conviction; b) that Room 48 was a typical motel room with the bathroom immediately to the right as one would enter the room; and c) that there were objects in the room which he suspected were narcotics. Based on this specific knowledge and his lengthy experience in law enforcement, a reasonable man in like circumstances would have believed that a person, like Mr. Nolan, with a prior narcot-ics conviction and still at large a fugitive, would be sufficiently alerted by announcement of even the police officers' identity that he would attempt to destroy the suspected narcotics and related paraphernalia by flushing them down the toilet.[7] Moreover, a reasonable person in Inspector Pongrace's position, knowing the physical layout of Room 48, and the position of the bathroom, would also know that he would be unable to distinguish whether or not noises he might hear from inside the room indicated the person was headed in the "wrong direction"[8]—to the bathroom to destroy evidence—or in the "right direction" —to open the door to admit the officers since both the "right" and "wrong" directions were the same. This Court therefore concludes that execution of the second entry was justified by exigent circumstances. Again this Court notes that despite the technical violation of section 3109, the officers made a substantial effort to comply with the spirit of that statute by announcing their authority before being met by significant resistance which temporarily absorbed their energies.

This Court also finds that Mr. Nolan was not permitted to return to his room by the officers as a pretext for seizing evidence. The officers established a stakeout designed to intercept Mr. Nolan before he could reach his room. They had sound reasons for desiring to arrest him outside of his room. The fortuitous choice of a parking space by Mr. Nolan was the only circumstance that caused the plan to fail. The Court therefore holds that the fruit of the second search need not be suppressed.

## IV.

### A.

The knock and announce rule that has been the subject of this discussion is appli-

---

**6.** Inspector Pongrace testified that he made the decision to enter in the manner that they did, thus it is his knowledge that is relevant.

**7.** *Compare, United States v. Manning*, 448 F.2d 992 (2d Cir. 1971) (en banc) (opinion per Friendly, C. J.)

**8.** This terminology is borrowed from *McClure v. United States*, 332 F.2d 19 (9th Cir. 1964) *cert. denied* 380 U.S. 945, 85 S.Ct. 1027, 13 L.Ed.2d 963.

cable to federal law enforcement officials pursuant to section 3109, as first discussed at length by the Supreme Court in *Miller v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958) and to state law enforcement personnel pursuant to the rule first enunciated in *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). Without significant discussion of its choice of remedy, the Supreme Court in *Miller* held that suppression of evidence was required for a violation of section 3109. In *Ker*, the Supreme Court stated that that case was the first case that had reached the Supreme Court since *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (suppression of evidence acquired for state violations of rights protected under Fourth and Fourteenth Amendment) which afforded a suitable opportunity for further explication of that holding in light of intervening experience. *Ker* 374 U.S. at 25, 83 S.Ct. at 1625. While the Supreme Court did not require that the evidence be suppressed in *Ker*, the Court's reasoning indicates that if the evidence were found to have been obtained improperly, suppression of evidence would have been required. Later, in *Sabbath v. United States*, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968) the Court held that even the most highly technical violation of section 3109 would inevitably lead to the suppression of the evidence.

Since the decision of these cases by the Supreme Court the exclusionary rule has been the subject of more extended scrutiny by the Supreme Court, other courts and legal scholars. In light of this scrutiny this Court believes that it is necessary to consider as an alternative ground for decision whether evidence must inevitably be suppressed when a violation of some rule designed to protect privacy interests may have been technically,[9] albeit, unwittingly violated. Assuming *arguendo* that exigent circumstances did not exist to justify either the first or second entry into Room 48, then the issue before this Court is whether the physical evidence must still be suppressed. For the reasons which follow this Court

believes this question must be answered in the negative.

### B.

Decisions of the Supreme Court extending over the last two decades have consistently examined whether application of the exclusionary rule is warranted by examining the deterrent effect that suppression of evidence would have on the incidence of police misconduct. *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969); *Terry v. Ohio*, 392 U.S. 1, 12–14, 88 S.Ct. 1868, 1875–1876, 20 L.Ed.2d 889 (1968); *Linkletter v. Walker*, 381 U.S. 618, 636–37, 85 S.Ct. 1731, 1741, 14 L.Ed.2d 601 (1965); *Mapp v. Ohio*, 367 U.S. 643, 657–59, 81 S.Ct. 1684, 1692–93, 6 L.Ed.2d 1081 (1961); and *Elkins v. United States*, 364 U.S. 206, 217–22, 80 S.Ct. 1437, 1444–46, 4 L.Ed.2d 1669 (1960). In the last decade, deterrence of police misconduct has become the Court's central, if not sole, concern. *Robbins v. California*, —— U.S. ——, —— – ——, 101 S.Ct. 2841, 2849–51, 69 L.Ed.2d 744, 755–56 (1981); *New York v. Belton*, —— U.S. ——, —— – ——, 101 S.Ct. 2860, 2862–64, 69 L.Ed.2d 768, 773–75 (1981); *Michigan v. DeFillippio*, 443 U.S. 31, 36–38, 99 S.Ct. 2627, 2631–32, 61 L.Ed.2d 343 (1979); *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976); *United States v. Janis*, 428 U.S. 433, 447–55, 96 S.Ct. 3021, 3028–32, 49 L.Ed.2d 1046 (1970); *United States v. Peltier*, 422 U.S. 531, 535–39, 95 S.Ct. 2313, 2316–18, 45 L.Ed.2d 374 (1975); *Michigan v. Tucker*, 417 U.S. 433, 445–50, 94 S.Ct. 2357, 2364–67, 41 L.Ed.2d 182 (1974); *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974). The most significant aspect of this question has really become whether or not any deterrence actually occurs. It is far from clear whether this goal is served by the exclusionary rule. *See, e.g., Robbins v. California, supra* —— U.S. at —— – —— & note 3, 101 S.Ct. at 2849–51 & note 3, 69 L.Ed.2d at 755–56 & note 3

---

**9.** Compliance with the knock and announce rule could not have had any possible effect on

the first entry into a vacant room. To require it is to require a charade.

(concurring opinion of Powell, J.); *id.* —— U.S. at ——, 101 S.Ct. at 2851, 69 L.Ed.2d at 757 (dissenting opinion of Rehnquist, J.); *Stone v. Powell, supra,* 428 U.S. at 496–502, 96 S.Ct. at 3053–3056 (concurring opinion of Burger, C. J.); *id.* at 536–42, 96 S.Ct. at 3071–74 (dissenting opinion of White, J.); *Coolidge v. New Hampshire,* 403 U.S. 443, 490–91, 91 S.Ct. 2022, 2050, 29 L.Ed.2d 564 (dissenting opinion of Harlan, J.) and *Government of the Virgin Islands v. Rasool,* 657 F.2d 582 (3d Cir. 1981) (concurring opinion of Adams, J.). *See also,* Canon, *The Exclusionary Rule: Have Critics Proven that it Doesn't Work?,* 62 Jud. 398 (1979); Oaks, *Studying the Exclusionary Rule in Search and Seizure,* 37 U. of Chi.L.Rev. 665 (1970); Schlessinger, *The Exclusionary Rule: Have Proponents Proven that it is a Deterrent to Police?,* 62 Jud. 404 (1979). With the inability to establish any clear relationship between the exclusion of evidence illegally obtained and the incidence of police misconduct, greater concerns about the high social cost of the routine application of the exclusionary rule to all infractions of the Constitution have been voiced. Recent developments have suggested that these social costs could be reduced by recognizing a good faith exception to the exclusionary rule.

The social cost of the exclusionary rule is generally explained in the following way: physical evidence is often highly probative of guilt and remains so no matter how it is obtained; [10] if such evidence is suppressed it may be difficult, if not impossible, to learn the truth in a trial and to convict those who are indeed transgressors of law. This permits the guilty to go free without any corresponding benefit to innocent persons who may have suffered a similar invasion of their rights, and without any personal punishment of the police wrongdoer. All of this leads the general public to believe that technicalities are more important than justice to the courts and leads to the erosion of public support in the ability of the courts to appropriately handle criminals. Conceivably, a sufficient erosion of public confidence would lead to instances of vigilantism with its attendant evils.[11]

In addition, several pragmatic difficulties with the current rule have been articulated. It is said that because police officers are not personally responsible for improper conduct, since the exclusionary rule operates indirectly, there is no incentive for the police to learn the proper standards or to adhere to standards that are seen by police to be at odds with their personal interests or those of their department. Perhaps a more significant difficulty is the complaint that even officers who try their best cannot predict the eventual judgment of the courts on the legitimacy of their earlier conduct.[12] Finally, the exclusionary rule may suffer horrendous side effects, prompting police

---

10. Professor Wright has suggested that the limitation of the exclusionary rule by a good faith standard be confined to its application to seizures of "real" or physical evidence. The reason for this restriction is that while physical evidence may speak for itself in a probative way, the exclusionary rule also forbids introduction of evidence that becomes unreliable because of the impermissible way in which it was obtained—i.e. the coerced confession—Wright, Must the Criminal Go Free if the Constable Blunders? 50 Tex.L.Rev. 736 (1972). Other commentators are in agreement. Ball, *Good Faith and the Fourth Amendment: the "Reasonable" Exception to the Exclusionary Rule,* 69 J. of Crim.L. and Criminology 635 (1978) and *Wilkey, The Exclusionary Rule: Why Suppress Valid Evidence?* 62 Jud. 214 (1978).

11. One wonders whether automatic and routine suppression under the circumstances here existing is not related to the explosive increase in crime.

12. As this Court is bound to follow the rules announced by the Supreme Court, I am fully able to empathize with the Highway Patrolmen who in 1975 conducted the search discussed by the Supreme Court in *Robbins v. California, supra.* In that case the Supreme Court held that the evidence should be suppressed but a majority of the Justices could not agree why. Perhaps even more perplexing is that the Supreme Court has requested briefing on whether the rule announced only on July 1, 1981 in *Robbins* should be overruled. See, 30 Criminal Law Reporter 1005, 1035 (*United States v. Ross,* —— U.S. ——, 102 S.Ct. 386, 70 L.Ed.2d 205).

officers to "twist" their testimony to justify their actions.[13]

In contrast to these problems defenders of the wide scope of the exclusionary rules argue that the rule was adopted to stop misconduct that "shocked the conscience", and that the exclusionary rule has not unduly hampered police work but has instead led to greater use of search warrants. Finally while conceding that deterrence of police misconduct has not been established, defenders of the universal application of the exclusionary rule contend no other remedy exists which holds any promise of deterrence.[14] While this Court remains sensitive to these objections, it cannot agree that universal and routine application of the exclusionary rule is now required. This Court believes that the opinions rendered in *Government of the Virgin Islands, supra* (Adams, J. concurring); *United States v. Williams,* 622 F.2d 830, 840 (Gee and Vance, JJ.) *id.* at 847 (Hill, J. concurring); *Richmond v. Commonwealth,* 50 U.S.L.W. 2162 (Ky.App. July 7, 1981) and *People v. Adams,* 53 N.Y.2d 1, 442 N.E.2d 537 (1981) point to the limitation of the exclusionary rule through a "good faith exception" which is applicable to the case before this Court. Why a law enforcement officer acting in good faith requires deterrence appears to me to clearly indicate that application of a good faith exception is long overdue.

**13.** See, generally, cases and articles cited on pages 395–396 and in note 8, supra.

**14.** See, e.g., Kamisar, Is the Exclusionary Rule an "Illogical" or "Unnatural" Interpretation of the Fourth Amendment? 62 Jud. 214 (1978).

**15.** Nothing in these remarks should be construed to free officers from an obligation to seek the advice of a lawyer in doubtful cases where circumstances permit such consultations. That possibility is one of many factors which bear on an assessment of the officer's good faith. The Court is satisfied that consultation was not feasible in the circumstances of the instant case.

**16.** The Court notes that there may be an important legal difference between uncertainties of fact and of law underlying the good faith exception to the exclusionary rule. Heretofore the courts have allowed defendants who raise

## C.

Before articulating this Court's understanding of the good faith exception, it seems appropriate to place the statement of the exception in proper context. To do so it is important to realize a good faith exception rests on three factors. First, police officers are not expert lawyers. They may lack information about the very latest cases or they may have legitimate doubts how known rules will be applied in the cases the officer confronts. Second, some times officers confront novel situations, where the law itself is unclear. Third, some times officers confront situations where legally important facts are unknown and are practically unknowable. In such cases officers should be encouraged to perform their important duties with confidence that their actions will not jeopardize the prosecution which they expect to follow.[15]

The recognition of a good faith exception to the exclusionary rule in such cases does not jeopardize constitutional values. In a world where the law is sometimes doubtful and an officer's knowledge about important facts is sometimes circumscribed, public expectations of official integrity cannot demand impossible standards of foresight or omniscience. Neither can judicial rules deter constitutional infringements where the officer, in good faith, has no reason to suppose his act to be wrongful in the circumstances he confronts.[16] The growth of a

novel constitutional claims the benefit of having newly declared constitutional rights applied in their cases. The extension of a "good faith exception" to cases of pure legal uncertainty would severely limit this possibility. It would serve to deter the development of constitutional doctrine relating to the criminal process. This is legitimately a matter of serious concern. It is this Court's view that when a decision is made in reliance on the good faith exception to the exclusionary rule, jurisprudential considerations require that the Court decide whether or not the actions of the officers was indeed lawful. See, *United States v. Williams,* 622 F.2d at 848; Contra, *Richmond v. Commonwealth,* —— S.W.2d —— (Ky.Ct.1981). Not to do so would undercut the responsible obligation of the Courts to articulate the contours of responsible conduct.

good faith exception seems to be a necessary corollary of the modern notion that constitutional doctrine is evolved in a case by case method, and does not simply "found" in pre-existing authorities.

Of course any good faith exception must rest on a finding that the officer is in fact well trained.[17] Constitutional values would be ill-served by an extension of such a rule to officers with pure hearts but empty heads. This would be true even in the imaginable case where a well-trained officer would have experienced serious doubt. The serious public concern to deter plainly unlawful police conduct seems to this Court to permit no equivocation on this point.

### D.

█ Because this is a relatively recent development, this Court feels constrained not to articulate the ultimate boundaries of the good faith exception, but instead states the rule cautiously in terms of the peculiar circumstances of the present case. When an officer is cognizant of the current law which defines the limits of his authority to act and he acts in a manner consistent with the spirit of that law or in a manner in which a reasonable man in like circumstances would view as consistent with that law, then physical evidence which was seized by virtue of an incidental incursion on a defendant's rights need not be suppressed when there appears to be no deterrent effect on the incidence of future police misconduct from suppression.

█ In this case the Court is convinced that Inspector Pongrace was in fact well-trained, and that he confronted serious uncertainties of fact and of law which bring him within the legitimate scope of the good faith exception to the exclusionary rule. Factually, before the first entry, Inspector Pongrace knew that the defendant was very probably to be found in a ground floor motel room with windows which could permit an easy escape. He also knew that the defendant was a fugitive, and he inferred,

justifiably, that the defendant would escape arrest if he could do so. Inspector Pongrace reasonably believed that he might need Deputy Holland's aid in the room to deter resistance or flight when he entered the room. This ruled out stationing Deputy Holland by the windows. What he did not know was the state of the windows; were they a ready avenue of escape, or were they . permanently closed so that they could not feasibly be used as an exit? In making the first entry, Inspector Pongrace acted within the scope of the good faith exception.

At the time of the second entry, the situation had changed. The arrival of additional officers enabled the inspector to be sure that a window escape could not succeed. But Inspector Pongrace had reason to believe that the defendant would destroy the materials on the table by flushing them down the toilet if the officers announced their presence. This reasonable concern justified the second entry as one accomplished in good faith.

Moreover, there was a second uncertainty which justified the first entry. The law relating to the "exigent circumstances" exception to the "knock and announce" rule was uncertain. In evaluating whether exigent circumstances existed prior to either the first or second entry, Inspector Pongrace was faced with a situation in which a precise rule of law has never been articulated. Extensive research by this Court has disclosed no case in which an exigent circumstance to make a no-knock entry existed because even mere announcement of identity by the police would result in an effort to escape by someone with the motive and a known propensity to flee or an effort to destroy evidence by an experienced narcotics violator who had an opportunity to destroy narcotics in moments. The most analagous case is *United States v. Manning*, 448 F.2d 992 (2d Cir. 1971). In that case, like most others in the no-knock area, escape and destruction of evidence were feared from noise of scurrying in the

---

**17.** The Court is satisfied that there is sufficient incentive to insure officers will be well-trained through the possibility of adverse civil litiga-

tion against individual officers and/or their departments.

apartment after mere announcement of identity. That mere announcement was a trigger is clear from the results of a five second wait by the officers, three escapes by the fire escape, two deaths from jumping out the window and the arrest of only one person in the act of escape. Since Inspector Pongrace was faced with an unknown rule of law, his actions must be governed by the spirit of the knock and announce rule, or whether a reasonable man in a like situation would have acted the same way. There is no need to discuss either of these rules at length. Since this Court has previously held that the entries were both lawful, even if that decision is incorrect, the inspector's interpretation of the situation must be considered at least a reasonable one, leading to reasonable actions. Moreover this Court has already taken note that the inspector endeavored to comply with the spirit of the rule by announcing himself as he entered. This effort served the threefold purposes of the knock and announce rule, safety, reduction of property damage, and protection of privacy.

The foregoing constitutes findings of fact and conclusions of law in accordance with Fed.R.Crim.P. 12(e) in support of its decision to deny the motion to suppress on September 28, 1981.