47 F.3d 1172
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff - Appellee,
v.
Andrew David PAVLIK, Geoffrey Richard Wiitala, Philip Irvin
Pavlik, and Randy Harvey Baker, Defendants - Appellants.
 Nos. 93-2494, 94-1132, 94-1189, 94-1191.
 United States Court of Appeals, Sixth Circuit.
 Feb. 13, 1995.
 
 Before: KEITH, JONES and MILBURN, Circuit Judges.
 PER CURIAM:
 
 
 1
 Defendants-Appellants appeal from their convictions and sentences for conspiracy to manufacture Methcathinone, in violation of 21 U.S.C. Sec. 846. For the reasons stated below, we AFFIRM, in part and REVERSE, in part.
 
 I. STATEMENT OF THE CASE
 
 2
 On February 17, 1993, a two-count indictment was returned against Defendant-Appellants Andrew Pavlik ("A. Pavlik") and Philip Pavlik, his brother ("P. Pavlik"), charging them with conspiracy to distribute Methcathinone during the summer of 1990 (Count One), and charging them, along with Douglas Howard Gane ("Gane"),[1] James Reno Ghiotto ("Ghiotto"),[2] and Defendant-Appellants Randy Harvey Baker ("Baker") and Geoffrey Richard Wiitala ("Wiitala"), with conspiracy to manufacture Methcathinone from the fall of 1990 until November 13, 1991 (Count Two). Both counts were based on violations of 21 U.S.C. Secs. 846, 813 and 802(32).
 
 
 3
 A. Pavlik and P. Pavlik entered guilty pleas to Count Two on June 8, 1993 and October 28, 1993, respectively. Baker and Wiitala were convicted of the crime charged in Count Two on November 3, 1993, after a three-day joint jury trial.
 
 
 4
 Pursuant to his plea agreement, A. Pavlik was sentenced on November 3, 1993, to thirty months imprisonment and three years supervised release. The plea agreement provided for a three-level downward adjustment for timely acceptance of responsibility, under USSG Sec. 3E1.1, and an additional four-level downward adjustment for substantial assistance to law enforcement, under USSG Sec. 5K1.1.
 
 
 5
 On January 31, 1994, an evidentiary hearing was held to determine the quantity of Methcathinone attributable to the remaining three defendants for purposes of sentencing. The court concluded the defendants could achieve a 50% yield from their Methcathinone laboratory and sentenced them accordingly. Based on this evidentiary hearing the defendants received the following sentences:
 
 
 6
 Baker: fifty-seven months in prison and three years supervised release.
 
 
 7
 P.Pavlik: pursuant to a plea agreement providing for a downward departure of three levels for timely acceptance of responsibility, under USSG Sec. 3E1.1, and an additional four-level downward departure for substantial assistance to law enforcement under Sec. 5K1.1, P.Pavlik received ninety-six months in prison and three years supervised release.
 
 
 8
 Wiitala: 121 months in prison and three years supervised release.
 
 
 9
 This timely appeal follows.
 
 II. FACTS
 
 10
 Methcathinone is an addictive powdered stimulant, used by inhalation or intravenous injection. The drug is manufactured from the primary precursor ingredient Ephedrine. At the time of the defendants' arrest, Methcathinone was considered a Controlled Substance Analogue pursuant to 21 U.S.C. Secs. 802(32)(A) and 813, because of its chemical and pharmacological similarity to Methamphetamine, a Schedule II controlled stimulant substance. On May 1, 1992, Methcathinone was classified as a Schedule I Controlled Substance.
 
 
 11
 In 1989 and 1990, P. Pavlik, while a student at the University of Michigan in Ann Arbor, became acquainted with the procedure for manufacturing Methcathinone. In the fall of 1989, P. Pavlik brought Methcathinone with him from Ann Arbor to Marquette, Michigan, where he gave a quantity to his brother A. Pavlik, who in turn gave lesser quantities to some of his friends.
 
 
 12
 During the summer of 1990, A. Pavlik went to Ann Arbor, got Methcathinone from his brother and transported it back to Marquette where he and others, including Wiitala ingested the drug. In August 1990, A. Pavlik and Wiitala acquainted Dean Grimes with Methcathinone at Wiitala's residence. In September 1990, Wiitala sold Methcathinone to Vince Swenor.[3]
 
 
 13
 In the fall of 1990, A. Pavlik, Wiitala and Gane went to Ann Arbor and obtained the formula for manufacturing Methcathinone from P. Pavlik. Upon their return to Marquette, Wiitala assembled the ingredients and equipment necessary to make Methcathinone. Wiitala, with the assistance of Gane and A. Pavlik, attempted, unsuccessfully, to manufacture Methcathinone. At Wiitala's request, P. Pavlik tried to salvage the botched batch but failed.
 
 
 14
 In late 1990, P. Pavlik returned to Marquette and taught Wiitala how to make Methcathinone. From that point forward Wiitala was able to successfully manufacture Methcathinone and did manufacture many batches. Additionally, Wiitala taught others how to manufacture the drug. Wiitala procured Ephedrine on several occasions, sometimes making the purchase himself and at other times having others get the drug for him. On February 1, 1991, Wiitala purchased 24,000 Ephedrine pills.
 
 
 15
 On February 21, 1991, Marquette Police responded to a call from the Pavliks' father, who reported he believed his twenty-one year old son, P. Pavlik, was experimenting with and having a negative reaction to some sort of homemade narcotic. Mr. Pavlik thought his son was having a negative reaction to the narcotic when he witnessed P. Pavlik's behavior become assaultive and physically violent.
 
 
 16
 Evidence was introduced at trial tending to support the government's assertion that Wiitala was the chief manufacturer of Methcathinone in the Marquette area. Wiitala taught and/or helped teach thirteen persons how to manufacture Methcathinone. Wiitala made Methcathinone at the homes of his parents and grandmother, and the homes of at least five other persons. He also participated in the manufacture of Methcathinone in several hotels. Wiitala sold and distributed the Methcathinone he manufactured to several people including A. Pavlik, Mark Santavy, Baker, Swenor, and Linda Bressette ("Bressette") and Cale Ross.[4]
 
 
 17
 In 1990 and 1991, A. Pavlik was present and assisted in the manufacture of Methcathinone in at least three different locations in Marquette, along with, in various combinations, P. Pavlik, Wiitala, Gane, Ghiotto, Grimes, Swenor and others. During the manufacturing process A. Pavlik assisted by folding paper filters, crushing crystallized chemicals, and washing glassware. On one occasion, he furnished the location where the Methcathinone was manufactured. He also attempted, unsuccessfully, to manufacture one batch of Methcathinone on his own.
 
 
 18
 In or about October 1991, Wiitala approached Baker about using his residence as a place to manufacture Methcathinone. Baker agreed, and for approximately three weeks Wiitala used Baker's house as his manufacturing and distribution center. The manufacture and distribution was performed with Baker's knowledge, consent and assistance. Baker received financial compensation for the use of his house.
 
 
 19
 Wiitala obtained the Ephedrine he used for one batch of Methcathinone through Bressette and Ed Mahaffey ("Mahaffey").[5] Bressette ordered 12,000 Ephedrine tablets to be delivered to Mahaffey. The pills arrived at Mahaffey's residence on November 5, 1991, and were then transported by Wiitala to 822 N. Fourth St., where the mailing label was discarded and then seized by police from the trash on November 11, 1991. Wiitala paid Bressette with two grams of Methcathinone from the batch he made at Baker's. On November 11, 1991, Baker ordered 12,000 Ephedrine tablets. The tablets were never delivered, however, because subsequent to a search of Baker's house on November 13, 1991, no one would agree to accept delivery of the pills.
 
 
 20
 The search of Baker's home was conducted pursuant to a federal search warrant. Police found and seized a Methcathinone laboratory which was hidden in the attic. Also seized was a triple beam balance scale; all of the equipment needed to produce Methcathinone; Sodium Dichromate (the oxidizer used to make Methcathinone); 9000 tablets of Ephedrine; 318 milligrams of Methcathinone; traces of Methcathinone in a glass jar; 193 grams of Ephedrine; and sulfuric acid.
 
 III. DISCUSSION
 A. "Knock and Announce" Statute
 
 21
 Appellant Baker argues the district court erred by failing to suppress his confession and evidence confiscated pursuant to an illegal search of his residence conducted November 13, 1991. An evidentiary hearing was held before Magistrate Judge Greeley. Judge Greeley found the officers violated the "knock and announce" statute but because of exigent circumstances the execution of the warrant was valid. Judge Greeley issued a report and recommendation consistent with his findings, which report was adopted by the district court.
 
 
 22
 Baker alleges the officers violated the "knock and announce" statute by failing to wait a reasonable amount of time for admittance before breaking in the front door, and further that exigent circumstances did not exist warranting a violation of the statute. See 18 U.S.C. Sec. 3109.[6] Under this statute, federal authorities executing a search warrant are required to announce their authority and purpose. After being refused admittance, either actually or constructively through unreasonable delay, they may then use force to gain entry. If authorities fail to comply with the requirements of the statute the fruits of their search must be suppressed. United States v. Nabors, 901 F.2d 1351, 1354 (6th Cir.), cert. denied, 498 U.S. 871 (1990) (citing Miller v. United States, 357 U.S. 301, 313-14 (1958)). Failure to comply with the statute does not automatically lead to suppression of any evidence gained where "exigent circumstances" exist making strict compliance imprudent. Id.
 
 
 23
 We review the district court's legal conclusions with respect to exigency de novo. United States v. Radka, 904 F.2d 357, 361 (6th Cir. 1990). Exigent circumstances exist when the officers have an objectively reasonable belief of an emergency situation. United States v. Spinelli, 848 F.2d 26, 29 (2d Cir. 1988).
 
 
 24
 The government argues that exigent circumstances existed in the instant case for several reasons, including the agents' belief that narcotics were being manufactured on the premises; dangerous chemicals were being used to manufacture the narcotics; the agents' general belief that drug traffickers usually have weapons; their discovery of an empty box of shotgun shells in the garbage outside the subject residence; and the possibility the occupants of the house had been notified of the raid. In support of its contention that exigent circumstances existed the government relies on Nabors, 901 F.2d 1351.
 
 
 25
 In Nabors, this court found exigent circumstances existed where the officers feared for their safety and the safety of those in the apartment, as well as the possible destruction of evidence. Nabors, 901 F.2d at 1354. The officers had an objectively reasonable belief that an emergency existed in Nabors, in part, because the officers knew the defendant was "suspected of trafficking in narcotics, was a felon in possession of an array of firearms, and habitually wore a bullet proof vest." Id. In addition to this court's holding in Nabors, the Sixth Circuit has routinely found exigent circumstances where there is a combination of illegal drugs and the presence of firearms. See e.g., United States v. Warner, (Unpublished opinion), Nos. 92-6432, 92-6507, 92-6508, 1993 WL 375799 (6th Cir. Sept. 23, 1993) (exigent circumstances exist when informant provides information that cocaine, pistols and AK47 assault rifle on premises); United States v. O'Neal, (Unpublished opinion), No. 92-5995, 1993 WL 133807 (6th Cir. April 28, 1993) (exigent circumstances where suspect flees to get firearm and dispose of cocaine); United States v. Smith, et. al., (Unpublished opinion), Nos. 90-4041, 90-4062, 1991 WL 158699 (6th Cir. Aug. 19, 1991) (exigent circumstances exist when occupants are armed and dangerous and possess cocaine which is easily disposable). See also, United States v. West, (Unpublished opinion), No. 93-5775, 1994 WL 256689 (6th Cir. June 10, 1994) (exigent circumstances exist where large amount of drugs present, and fear of imminent destruction of evidence).
 
 
 26
 The instant case is distinguishable, however, from the cases cited supra. In Warner, O'Neal and Smith, this court determined that exigent circumstances existed where (1) the contraband in question was an easily disposable drug such as cocaine and (2) the officers had reliable information that the occupants were armed and dangerous. In West the authorities had reliable information that the subject premises contained about $600,000 worth of cocaine. Such is not the case here. The officers had no reliable information that any of the occupants was armed or dangerous, or that there was a significant quantity of illegal drugs on the premises. Of the people the authorities suspected were in the house none had a criminal record or a history of violent behavior.
 
 
 27
 Evidence was introduced at the suppression hearing that two days prior to the raid the officers removed an empty box of shotgun shells from the garbage. This evidence cannot rise to the level of supporting a reasonably objective belief that the occupants were armed. First, deer hunting season was just about to begin in Michigan. In the Upper Peninsula, many residents participate in the sport and any number of citizens could have thrown away the empty box of shells. Additionally, there was no independent evidence that weapons were secreted in the subject property.
 
 
 28
 Further, this court held in Smith, supra, that noncompliance with Sec. 3109 is not warranted anytime authorities think a warrant suspect may be armed. Id. at * 8. To be a valid exception to the "knock and announce" requirement of Sec. 3109 the exigency must be "clear" and "manifest" and include both "the possibility of destruction of evidence and the danger of harm to the officers." Id. In the instant case there was no clear indication that the destruction of evidence was imminent. The officers suspected the existence of a clandestine lab with precursor drugs and equipment necessary to manufacture Methcathinone. Under these circumstances it is unlikely the evidence could be destroyed in a short period of time. The lab would have to be dismantled, secreted and/or destroyed along with all the ingredients necessary to manufacture the drug.
 
 
 29
 The officers testified at the evidentiary hearing they were concerned for their safety because of the volatile nature of the chemicals. They were afraid the chemicals would be used against them. Although a valid concern, the officers could have taken precautions to avoid endangering themselves without violating section 3109. In fact, the officers did wear protective clothing, rubber gloves and special boots, and were equipped with gas masks. Additionally, the officers arrived at the scene with an Emergency Medical Services crew, in the event of injury, and a fire truck. Those were the appropriate steps to take to avoid injury, not the easier, yet impermissible, step of abrogating the "knock and announce" statute.
 
 
 30
 This court also stated plainly in Nabors its determination that exigent circumstances existed was a close call and subsequent cases would be carefully scrutinized for compliance with the requirements of Sec. 3109. Nabors, 901 F.2d at 1351. This assertion of a "close call" was made in the face of a defendant who was known to be in possession of an "array of firearms," who "habitually wore a bullet-proof vest," and was suspected of "trafficking in narcotics." Id. at 1354. Given that this court characterized Nabors as a "close call," we are reluctant to find an exigency when circumstances less dangerous than those present in Nabors exist. Other than the suspicion of narcotics, none of the inherent dangers present in Nabors were present in the instant case.
 
 
 31
 In light of this court's holding in Nabors and subsequent cases, we find that the circumstances presented here do not create an exigency sufficient to disregard the "knock and announce" statute.
 
 B. Multiple Conspiracies
 
 32
 Wiitala argues the district court erred by failing to instruct the jury pursuant to Sixth Circuit Pattern Instruction 3.08 on the defense of multiple conspiracies. The government argues Wiitala waived this issue for appellate review when his counsel failed to specifically object to the jury charge after the charge had been given to the jury.
 
 
 33
 When no objection is made at trial this court reviews a jury instruction for plain error. If, however, a proper objection was made at trial, the instruction is reviewed for an abuse of discretion. United States v. Busacca, 863 F.2d 433, 435 (6th Cir. 1988), cert. denied, 490 U.S. 1005 (1989). The parties here dispute whether an appropriate objection was lodged at trial. At the close of jury instructions the court asked the parties whether they had any matters that need be placed in the record. Wiitala's counsel responded "Not other than my objections to the original instructions, Your Honor." The court informed him that his objections were reserved. Therefore, the instruction is reviewed for an abuse of discretion.
 
 
 34
 A jury instruction must be viewed in its entirety to determine whether it fairly and adequately presents the issues and law to the jury. United States v. Martin, 740 F.2d 1352, 1361 (6th Cir. 1984), cert. denied, 472 U.S. 1029 (1985). In the instant case Wiitala alleges that the evidence elicited at trial supports a multiple conspiracy theory and the jury should have been instructed accordingly. Wiitala asserts that there was an Ann Arbor conspiracy and a Marquette conspiracy. The court reasoned, however, that the indictment and the evidence presented at trial was that of one large conspiracy covering the manufacture and sale of drugs in both Ann Arbor and Marquette. The court instructed the jury as to the elements the government needed to prove in order for the jury to find the defendants guilty of the conspiracy as charged.
 
 
 35
 This court held in United States v. Lash, 937 F.2d 1077, 1086 (6th Cir.), cert. denied, 112 S.Ct. 943 (1992), that a district court is not required to instruct the jury on multiple conspiracies when one conspiracy is alleged and proved at trial. Under Lash, the instruction given to the jury was not reversible error.
 
 C. Specific Intent
 
 36
 Wiitala argues the district court erred by failing to charge the jury on specific criminal intent regarding an analogue. Wiitala failed to raise this objection below, therefore the court's instruction is reviewed for plain error, Busacca, 863 F.2d at 435. Under these circumstances, we will only reverse if a miscarriage of justice would otherwise result. United States v. Wuliger, 981 F.2d 1497 (6th Cir. 1992), cert. denied, 114 S.Ct. 1293 (1994). Absent a requirement in the statute, the government need not prove that the defendant knew manufacture of a specific drug is in violation of federal law. See United States v. Balint, 258 U.S. 250, 254 (1922).
 
 
 37
 As discussed supra, a jury instruction must be viewed in its entirety to determine whether it fairly and adequately presents the issues and law to the jury. Martin, 740 F.2d at 1361. In the instant case, the district court properly charged the jury as to each and every element of the conspiracy including the requirement that defendant "knowingly and voluntarily" joined the conspiracy.
 
 D. Laboratory Yield
 
 38
 Wiitala, P. Pavlik and Baker contend the district court erred in its determination of the quantity of Methcathinone attributable to each defendant for the purpose of determining the defendants' respective base offense levels ("BOL") and corresponding sentences. This court reviews for clear error a district court's factual findings with respect to drug quantities. United States v. Moss, 9 F.3d 543, 552 (6th Cir. 1993). The government must establish the quantity of drugs by a preponderance of the evidence. Id.
 
 
 39
 In the instant case the government presented the expert testimony of two chemists, Mr. Dal Cason and Ms. Bell, each of whom conducted tests to determine the yield of Methcathinone relative to the amount of precursor drug, Ephedrine, used by the defendants. The expert chemists used the formula developed by Parke-Davis for the manufacture of Methcathinone, which was the exact formula used by the defendants. Parke-Davis touted an expected yield of approximately 85%. That is, the trained chemists in a professionally controlled environment could expect to manufacture 85 grams of Methcathinone for every 100 grams of ephedrine used in the manufacturing process.
 
 
 40
 Mr. Dal Cason conducted two experiments and was able to achieve yields of 65% and 27% respectively. Ms. Bell conducted only one experiment and achieved a yield of 55.2%. Mr. Dal Cason further testified in his expert opinion it was not unreasonable to expect a 50% yield from clandestine laboratories of the type used in this case. The defendants submitted testimony from their expert, Dr. Sandel. Dr. Sandel was unable to offer an opinion as to what the expected yield should be from a clandestine laboratory. He did, however, suggest that other factors should be taken into consideration, such as the experience level of the "cook."
 
 
 41
 Based on the foregoing testimony, the district court determined that a 50% yield was the appropriate factor to use in determining the BOL of each defendant. In reaching its conclusion the district court interpreted USSG Sec. 2D1.1, Application Note 12.[7] The defendants argue the court should have taken into account the relative experience level of the "cook" in reaching its conclusion and arriving at a BOL for each defendant.
 
 
 42
 When estimating the quantity of drugs involved it is appropriate for the district court to consider the size and capability of a drug laboratory. United States v. Brannon, 7 F.3d 516, 520 (6th Cir. 1993). If the district court's estimate is supported by credible evidence in the record it cannot be clearly erroneous. Id. Here, the government presented two expert witnesses who were able to conclude that a clandestine laboratory could produce yields in excess of 50%. The defendants' expert was unable to contradict the findings of the government's experts.
 
 
 43
 Given the expert testimony presented at trial it was not clearly erroneous for the district court to conclude the laboratory was capable of a 50% yield, a figure significantly less than the highest yields achieved by Parke-Davis and the two expert chemists.
 
 E. Defendants' Roles In The Conspiracy
 
 44
 A. Pavlik, P. Pavlik, and Wiitala assert that the district court erred in its determination of their respective levels of participation in the conspiracy.
 
 1. P. Pavlik
 
 45
 P. Pavlik argues the district court erred by assessing him with a four-level upward adjustment pursuant to USSG Sec. 3B1.1(a) for his role as a leader in the conspiracy. P. Pavlik further argues that he should have received a two-level downward adjustment for his minor role in the conspiracy. This court reviews the district court's sentencing enhancements pursuant to Sec. 3B1.1(a) for clear error. United States v. Alvarez, 927 F.2d 300, 303 (6th Cir.), cert. denied, 500 U.S. 945 (1991). Evidence was presented at trial that P. Pavlik was responsible for the spread of Methcathinone from Ann Arbor to the Upper Peninsula and beyond.
 
 2. Wiitala
 
 46
 Wiitala argues the court erred by assessing a four-level upward adjustment pursuant to USSG Sec. 3B1.1(a) for his role as a leader in the conspiracy. Evidence was presented at trial that Wiitala taught several individuals how to manufacture Methcathinone. The appellant has failed to demonstrate that the district court's findings of fact with respect to his role in the conspiracy were clearly erroneous.
 
 3. A. Pavlik
 
 47
 A. Pavlik received no adjustments in his offense level pursuant to USSG Sec. 3B1.1(a). He argues that he should have received a four-level downward adjustment pursuant to USSG Sec. 3B1.2 due to his minor role in the conspiracy. A. Pavlik failed to object to his Presentence Report as it stood at the time of sentencing and therefore any objection here is waived.
 
 
 48
 In light of the evidence presented, the district court was not clearly erroneous in its determination of the Defendants-Appellants' respective offense levels.
 
 F. Acceptance of Responsibility
 
 49
 Baker and Wiitala argue the district court erred by failing to grant them a downward adjustment for acceptance of responsibility pursuant to USSG Sec. 3E1.1. The district court's findings with respect to acceptance of responsibility are factual and are therefore reviewed for clear error. United States v. Tucker, 925 F.2d 990, 991 (6th Cir. 1991). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. Moreno, 933 F.2d 362, 374 (6th Cir.), cert. denied, 112 S.Ct. 265 (1991).
 
 
 50
 Wiitala fails to bring forth any evidence tending to support his naked assertion that he is entitled to a downward adjustment pursuant to USSG Sec. 3E1.1.
 
 
 51
 In light of our finding that the evidence gathered against Baker was procured as a result of an illegal search, we need not determine at this time whether he is entitled to a downward adjustment for acceptance of responsibility.
 
 IV. CONCLUSION
 
 52
 For the foregoing reasons the convictions and sentences of Andrew David Pavlik, Geoffrey Richard Wiitala and Philip Irvin Pavlik are AFFIRMED; the conviction and sentence of Randy Harvey Baker is VACATED and REMANDED for resentencing consistent with this opinion.
 
 
 
 [1]
 Gane pled guilty to Count Two and was sentenced to a term of thirty-seven months. He has not appealed his sentence
 
 
 [2]
 Ghiotto pled guilty to a conspiracy to manufacture methcathinone charged in a separate indictment and was sentenced to a term of twelve years. He has not appealed his sentence
 
 
 [3]
 Grimes and Swenor have both pled guilty to federal felonies in the Western District of Michigan in connection with their use of Methcathinone. They have not appealed their sentences
 
 
 [4]
 Bressette and Ross each pleaded guilty to a federal Methcathinone felony in the Western District of Michigan and each was sentenced to thirty-seven months. Neither has appealed
 
 
 [5]
 Mahaffey pleaded guilty to a Methcathinone felony in the Western District of Michigan and was sentenced to eighty-seven months. His appeal is now pending in this court, No. 94-1287
 
 
 [6]
 18 U.S.C. 3109 provides that:
 [An] officer may break open any outer or inner door or window of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.
 
 
 [7]
 USSG Sec. 2D1.1, Application Note 12 states in pertinent part:
 Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination the court may consider ... the size or capability of any laboratory involved.